R. H. McWILLIAMS, JR., CO., INC.,

*Complainant,*

*vs.*

MISSOURI-KANSAS PIPE LINE COMPANY, a corporation, FRANK P. PARISH & CO., a corporation, KENTUCKY NATURAL GAS COMPANY, a corporation, and INDIANA-KENTUCKY NATURAL GAS CORPORATION, a corporation,

*Respondents.*

R. H. McWILLIAMS, JR., CO., INC.,

*Complainant,*

*vs.*

MISSOURI-KANSAS PIPE LINE COMPANY, a corporation, FRANK P. PARISH & CO., a corporation, KENTUCKY NATURAL GAS COMPANY, a corporation, and INDIANA-KENTUCKY NATURAL GAS CORPORATION, a corporation,

*Respondents.*

PEOPLES-PITTSBURGH TRUST COMPANY, as Trustee under the Collateral Trust Indenture, dated March 15, 1931, of MISSOURI-KANSAS PIPE LINE COMPANY,

*Complainant,*

*vs.*

MISSOURI-KANSAS PIPE LINE COMPANY, HENRY T. BUSH and C. RAY PHILLIPS, Receivers of Missouri-Kansas Pipe Line Company,

*Defendants.*

*New Castle, Dec. 18, 1936.*

*Arthur G. Logan,* of the firm of Marvel, Morford, Ward & Logan, of Wilmington, for Henry T. Bush and C. Ray Phillips, receivers of Missouri-Kansas Pipe Line Company.

*Marvel, Morford, Ward & Logan,* of Wilmington (*Borders, Borders & Warrick,* of Kansas City, Mo., and *Henry Wagstaff Ryan,* special counsel, of New York City), for said receivers.

*Jacob Schechter,* of New York City, for Schechter,

Cutler, Saulzberger & McMahon, special counsel for receivers.

*Raymond G. Real,* of the firm of Glenn, Real & Browning, of Chicago, Ill., for Thurlow G. Essington, ancillary receiver, and *Glenn, Real & Browning,* of Chicago, Ill., for ancillary receiver.

*Joseph V. McCabe,* of the firm of Gibbs, Hand & McCabe, of New York City, for New York Stockholders' Protective Committee, Joseph V. McCabe, and I. A. Theiss.

*Kenneth E. Walser,* of the firm of Spence, Hopkins, Walser & Hotchkiss, of New York City, for Richard B. Hand and I. A. Theiss.

*John Biggs, Jr.,* of Wilmington, in *propria persona.*

*Joseph V. McCabe,* of the firm of Gibbs, Hand & McCabe, of New York City, for Brokaw, Dixon & McKee.

*Irving Herriott,* of the firm of Montgomery, Hart, Pritchard & Herriott, of Chicago, Ill., for Chicago Stockholders' Protective Committee and Montgomery, Hart, Pritchard & Herriott.

*W. L. Cohn,* of Denver, Colo., for L. W. Linville, attorney for Colorado Stockholders' Protective Committee.

*James M. Malloy,* of Wilmington, *in propria persona.*

*Carlos Israels,* of the firm of White & Case, of New York City, for Colony Realty & Investment Co. and White & Case.

*Aaron Finger,* of Wilmington, for Richards, Layton & Finger.

*Monroe Percy Block,* of New York City, *in propria persona.*

*Gilbert F. Wagner,* of Chicago, Ill., *in propria persona.*

*Reuben Satterthwaite,* of the firm of Satterthwaite & Foulk, of Wilmington, and *Charles M. Hay,* of St. Louis, Mo., for Dupuy G. Warrick.

*Purk Chamberlain,* of New York City, for Frank P. Fisher, Lillian C. Haas, Julius M. Naiman, Luke J. Scheer, and Stephen M. Walter.

° *Theodore E. Rein,* of Chicago, Ill., for Sabath, Perlman, Goodman & Rein.

*Roger Q. White,* of Chicago, Ill., for White & Hawxhurst.

*Ivan Culbertson,* of Wilmington, for Thomas F. Wickham.

The following opinion was filed by the Chancellor in disposing of petitions for allowances for compensation for services claimed to have been rendered and expenses to have been incurred in connection with the receivership of Missouri-Kansas Pipe Line Company.

THE CHANCELLOR: Receivers were appointed by this court for Missouri-Kansas Pipe Line Company, hereinafter referred to as Mokan, on March 18, 1932, on the ground of insolvency, under *Section* 3883 of the *Revised Code of* 1915.

The corporation was a holding company, its principal assets consisting of all the common capital stock, one thousand shares of the preferred stock of Kentucky Natural Gas Company, over two million dollars of its mortgage bonds and nearly three million dollars of unsecured claims against it; and of one hundred shares of common stock and voting trust certificates representing all of the remaining outstanding common stock of Panhandle Corporation which was the owner of one-half of the outstanding stock of Panhandle Eastern Pipe Line Company.

The assets of the corporation as shown by its consolidated balance sheet were stated to be worth (using round figures) twenty-eight million dollars, and its total liabilities were stated as amounting to ten million dollars. Thus an equity for its stock was shown of eighteen million dollars. The outstanding stock consisted of 1,586,617 shares of common of the par value of five dollars per share, and 781,977 shares of class B stock of the par value of one dollar per share.

When receivers were appointed the cash on hand was negligible, about eleven hundred dollars.

The subsidiaries of the corporation were heavily involved in debt. Notwithstanding the pretty picture of the consolidated balance sheet, the company was in a deplorable financial situation.

By a foreclosure suit and a reorganization of the Kentucky Natural Gas Company, after the receivers were appointed, the insolvent lost the major part of its investments in its subsidiaries. The details of what took place in the salvaging process need not be recited. Such recital would run to great and unwarranted lengths. The net result is all that need be stated. That result was that after early in 1933 the receivers possessed the following assets as substantially representing the entire eighteen million dollars of equity formerly shown by the balance sheet as belonging to the issued stock of the company: 52.09% of the common stock of Kentucky Natural Gas Corporation (the reorganized Kentucky Natural Gas Company) or about 20,788 shares; 2,860 shares of the preferred stock of said corporation; 250 shares of Panhandle Corporation which represented a one-eighth ownership of the common stock of Panhandle Eastern Pipe Line Company; and claims for damages under the anti-trust laws of the United States against Columbia Gas and Electric Corporation and Columbia Oil & Gasoline Corporation, hereinafter conveniently referred to as Columbia, and others.

Panhandle Eastern Pipe Line Company was a corporation possessing large and valuable natural gas properties in the Panhandle of Texas. It owned a pipe line having a length of about two hundred and fifty miles for the transportation of natural gas from the Panhandle field in Texas to the Illinois-Indiana state line. Mokan had an investment in that company in the neighborhood of thirteen or fourteen million dollars, represented by a one-half ownership of its outstanding stock and certain of its notes, which were held by its wholly owned subsidiary, Panhandle Corporation. Columbia owned the other one-half of the stock. Panhandle Eastern was obligated on a twenty million dollar

first mortgage bond issue and on about eleven million dollars of notes. Due to conditions not necessary to recite, Mokan, when the receivers were appointed, was in grave danger of losing its entire interest in Panhandle Eastern Corporation.

As a result of the proceedings before referred to, the receivers salvaged out of Mokan's one-half interest in Panhandle Eastern Corporation stock the one-eighth interest before mentioned. The one-eighth interest remaining to it, however, was far from being safe from the jeopardy of total loss. This was for the reason among others that the bond and note issues of Panhandle Eastern Corporation were in default. Those issues were in the control of the Columbia interests who also were in charge of the management of Panhandle Eastern Corporation. Serious and bitter conflicts between Mokan and Columbia over the policies to be pursued by and the management of Panhandle Eastern, had brought its operation into a state of injurious uncertainty and had arrested its development to a point short of where, with a further extension of its lines, the profitable operation of its business could be achieved. Its affairs were apparently in a hopelessly static condition, when what it sorely needed was a program of expansion under the guidance of a management unencumbered by internal strife and apprehension and fear for the future consequent therefrom.

Two later factors were prominent in its situation which gave cause to the Columbia group in control of its management to hesitate before committing it to anything in the way of an aggressive policy of activity. These were first, the assertion by the receivers of the very large claim for damages against the Columbia group before mentioned, and second, a suit instituted by the United States Government in the Federal Court of the United States for the District of Delaware against the Columbia companies in which the relief sought was an injunction against that group restraining it from its control over Panhandle Eastern

Corporation in alleged violation of the anti-trust laws (15 *U. S. C. A.* § 1 *et seq.*).

The situation of the Panhandle Eastern Corporation was one of costly lethargy from about February, 1933, when the one-eighth interest in its stock was salvaged by the receivers out of a foreclosure proceeding, to April 29, 1936, when an order was passed by this court directing the receivers to enter into a compromise settlement with the Columbia companies of the claims asserted against them for damages. The offer of settlement was made by those companies in obedience to one of the terms of a stipulated decree entered by the Federal Court, District of Delaware, in settlement of the anti-trust suit pending in that court.

As a result of said settlement agreement the receivers in behalf of Mokan are to be restored to the one-half interest in Panhandle Eastern Corporation formerly held by Mokan. There are numerous other features of the settlement which are of great advantage to the estate of the insolvent. There is no occasion to elaborate upon the details of those features further than to state that the Columbia companies receive in exchange for the considerations moving to Mokan a complete release from the cause of action asserted against them in the bill filed against them by the receivers in the Federal Court in New York for treble damages under the federal anti-trust laws (15 *U. S. C. A.* § 15) ; and satisfactory provision is made for the financing of an extension of the Panhandle Eastern pipe line so as to enable it to supply natural gas to the City of Detroit, a desirable contract to that end having been negotiated by Messrs. Parish and Warrick. One of the Columbia companies paid those gentlemen one hundred and twenty-five thousand dollars for their services in negotiating that contract.

The settlement as finally arrived at was acceptable to all parties in interest. As a result of the settlement, an estate which at the outset was hopelessly insolvent is estimated as of the settlement date to have a value of between

eight and twelve million dollars exclusive of the interest it retains in the Kentucky Natural Gas Corporation and of a claim for damages under the federal anti-trust laws against Standard Oil Company of New Jersey and Cities Service Company, and others, suits to recover which had been instituted in the federal court in New York by Mokan before the receivers were appointed and which the receivers are no wconducting. At present the estate is estimated to have a value of several millions more than twelve million dollars.

As illustrating the opinion of investors concerning the dubious value of the visible Mokan's assets available for the equity of its common stock when the receivers were named, one of its directors, after the receivers were appointed, exposed to public sale about fifteen thousand shares of its stock and sold the same to the highest bidder for the sum of six dollars for the entire block. (Since the settlement, the common stock is quoted as selling as high as ten dollars per share.) Furthermore, the receivers at one time were of the opinion that three hundred thousand dollars was all that the claims against the Columbia companies were worth, and petitioned this court for an approval of a settlement of those claims for that amount. The petition was denied.

As the sequel has shown, the claims against the Columbia companies proved to have a value of about twelve million dollars, this being the supposed net value of the one-half interest in Panhandle Eastern stock which the settlement has restored to Mokan.

The order approving the settlement directed that all persons asserting any right to compensation for services and expenses in connection with the receivership should file their claims on or before a designated day.

In response to this order thirty-two claims have been filed for compensation for services rendered and for expenses. The total asked for is the sum of two million, seven hundred thousand dollars. Each claimant is quite positive

that he is entitled to be compensated and that the amount asked for by him is fair and reasonable. Yet the aggregate of the sums requested is so shockingly out of line with what reason suggests as fairly chargeable against the estate, that one of two things is perfectly apparent, *viz.,* either some of the service for which compensation is sought are not properly compensable out of this estate, or, if compensable, the amounts asked therefor are in excess of what is fair and reasonable. As appears from what follows, the total of the requests is swollen by both of these factors. It becomes the unpleasant duty of the court to employ its pruning hook to lop off the claims which are not entitled under the law to any recognition whatever, and its shears to trim the others to what appears to the court as reasonably and fairly allowable.

In this matter of allowances, the court must bear in mind that as the allowances it makes are out of funds belonging to others, it does not possess the same freedom of disposition that they have who are dispensing moneys that are their own. Generosity is highly commendable except when practiced at the enforced expense of others. While the court owes to the lawyers who assist it in the administration of an insolvent estate the duty of compensation, yet a reciprocal duty is owed by them to the court not to ask of it to be compensated on a scale that would bring the court as a dispenser of justice into disrepute and supply plausible grounds for the belief on the part of the public that, out of a spirit of camaraderie existing between the bench and the bar, the law, when opportunity affords, is to be employed as an instrument to enrich its votaries at the expense of the unfortunates whom adversity had placed at its mercy. These are the considerations which have prompted the judicial announcement that in such matters as the pending one, there is no room for the practice of "vicarious generosity," Chief Justice Taft, *In re Gilbert,* 276 *U. S.* 294, 48 *S. Ct.* 309, 72 *L. Ed.* 580; and that so far as receivers and trustees and their attorneys, who are all officers of the

court, are concerned, they can neither expect nor be paid more than "moderate compensation." *In re New York Investors,* (*C. C. A.*) 79 *F.* (Bd) 182; *In re Paramount-Publix Corporation,* (*D. C.*) 12 *F. Supp.* 823.

There are certain general principles by which the right to be compensated is to be tested. As receivers and their counsel are officers of the court, acting by designation of the court in aid of its task of administering an estate, they are entitled to be compensated for their services and reimbursed them out of pocket expenses.

As to claims for compensation asserted by persons other than the receivers and their counsel, the following should be stated as peculiarly applicable in the instant case. It is a misconception for parties interested in a corporate receivership, such as stockholders, to entertain the view that each is at liberty to busy himself in the affairs of the receivership and to be compensated therefore as a matter of course. If it were so, the court would be at the mercy of volunteers and the estate would be consumed by its self-appointed assistants. It is a principle which courts of equity have long recognized, that a complainant in a creditors' bill who has caused a trust fund to be brought into the court for the benefit of himself and other creditors, should be allowed a reimbursement out of the fund of all his costs and expenses, including fees to his solicitors, on the principle that those who share with him in the benefits of the suit ought in justice to share with him the burden of its prosecution. But this principle has never been extended in the absence of statute beyond the point of reimbursement of costs and expenses incurred; it has never been extended by the courts so as to include compensation to the creditor complainant for his personal services and activity in the common cause. Such personal activity is referable to the personal interests of the individual. A receivership in the outcome of which many persons, creditors and stockholders, are interested, is in respect of the matter of allowances to creditors and stockholders, comparable to a creditor's bill.

It makes no difference in the application of the governing principle with respect to allowances whether the common fund be thought of as created by the applicant or thought of as preserved by him. The principle is the same. Authority for the foregoing views may be found in the following cases. *Trustees of Internal Improv. Fund v. Greenough*, 105 *U. S.* 527, 26 *L. Ed.* 1157; *Central R., etc., Co. v. Pettus*, 113 *U. S.* 116, 5 *S. Ct.* 387, 28 *L. Ed.* 915; *In re Paramount-Publix Corp.*, (*D. C.*) 12 *F. Supp.* 823, 826, 827.

It is not often that creditors or stockholders undertake individually to engage in activities in behalf of a receivership administration. The usual and familiar procedure is for a few persons to organize themselves into a committee to represent the interests of a common class. Now the right of such committees to be compensated cannot in reason rise to any higher dignity than can the right of the individual creditors or stockholders whose agents they are. This was held to be the rule in *Penington v. Commonwealth Hotel Construction Corp.*, 18 *Del. Ch.* 238, 158 *A.* 140. Voluntary committees who are mere agents of creditors or stockholders are entitled to be compensated and only in the same degree as their principals would be, that is to say, only to the extent that they have incurred expense in the business of creating or preserving the common fund. Any expenses they have incurred in other connections as for instance in watching the progress of the administration, conferring with the receivers, gratuitously advising them and assuming generally to act as overseers of the receivers, cannot be compensated for out of the estate. Such activities and the expense incident thereto, unless they result in a very material and demonstrable sense in either creating or preserving the fund, must be paid for by the group whom the committee represents.

In the case of *In re Paramount-Publix Corp., supra*, it was said that where a court has appointed receivers in an insolvency proceeding who are represented by competent counsel, there is ordinarily "no room for independent par-

ticipation in the administration of the estate and any one who, without court authorization, performs administrative services, no matter how meritorious, or incurs expense, must look solely to his own clients for payment." See, also, *In re New York Investors* (*C. C. A.*) 79 *F.* (2d) 182.

There are cases under *Section 77B* of the *National Bankruptcy Act* (11 *U. S. C. A.* § 207) wherein reorganizations are sought for corporations, in which the courts have allowed compensation to committees and their counsel, entirely aside from any considerations having to do with the creation or preservation of a common fund. But those cases in no wise derogate from the principles hereinabove stated as applicable to an equity receivership. This is for the reason that *Section 77B* of the *National Bankruptcy Act* supplies express statutory warrant for compensating committees and their counsel.

In the course of this receivership there were three particularly important not to say critical problems that came to a head at separated stages in its progress.

The first arose soon after the receivers were appointed. It was precipitated by a suit to foreclose an issue of Two Year 6% Collateral Trust Notes in the face amount of one million, sixty thousand dollars. The suit threatened practically to remove Mokan as a one-half owner, through Panhandle Corporation, of Panhandle Eastern Pipe Line Company, a company owning gas properties and a pipe line costing between forty-five and fifty million dollars. At the same time Mokan's investment in its subsidiary, Kentucky Natural Gas Company, was in like jeopardy of extinction due to a foreclosure suit against that company and a receivership for it. The receivers here, by the aid and assistance of Mr. Essington, ancillary receiver of Mokan appointed by the Federal Court in Illinois, negotiated a settlement of the foreclosure suit. The settlement was implemented with a then pending and subsequently consummated reorganization of Kentucky Natural Gas Company. Such settlement was approved by this court after hearing

and by the Illinois Federal Court. The settlement yielded to the receivers the Kentucky Natural Gas Corporation stock before referred to and enabled them to retain a one-eighth interest in Panhandle Eastern Pipe Line Company, an interest which, though considerably less than the one-half theretofore owned, nevertheless constituted a substantial one. In connection with this settlement, some of the claimants other than the primary and ancillary receivers and their counsel, claim to have rendered services, for which they should be compensated. Their services consisted in opposing the settlement. After hearing, their objections were overruled by the court. I think nothing should be allowed as compensation for services in that connection other than to the receivers in the two jurisdictions and their counsel.

The second critical problem of the receivership was posed by the receivers who made application on May 23, 1934, for authority to execute a settlement agreement between themselves for Mokan on the one side and Columbia on the other. The proposed settlement contemplated the surrender to Columbia by the receivers of Mokan's entire one-eighth interest in Panhandle Eastern Pipe Line Company and the granting of a release to the Columbia companies, their officers and directors, of all claims for damages against them asserted under the anti-trust laws or otherwise, in consideration of the receipt by the receivers of securities having an estimated value of about three hundred thousand dollars.

After an extended hearing this court refused to authorize the receivers to enter into the settlement agreement. On January 31, 1936, a settlement of the same controversies with the Columbia companies which the receivers' negotiations of May 23, 1934, had attempted to adjust, was negotiated by Dupuy G. Warrick. This settlement, after certain improvements in its terms were secured by the receivers, was authorized by the court after notice to all parties interested. Instead of yielding to the estate a

total of securities in the estimated value of three hundred thousand dollars, as did the receivers' negotiations, the new settlement yielded securities of an estimated value of twelve million dollars plus and three hundred thousand dollars in cash. In view of this situation, it is clear that those parties in interest who incurred expense in successfully opposing the settlement negotiated by the receivers, may be very properly described as having done so in the course of preserving the common fund for the benefit of all who were interested therein. Reimbursement should be allowed for that expense.

The third major problem of the receivership was whether or not the settlement which was negotiated by Warrick and submitted to the receivers on January 31, 1936, with the improving modification which they secured should be authorized. After due hearing it was authorized by order of this court on May 29, 1936. This settlement yielded the twelve million dollars plus just referred to. The negotiation of this setlement was what yielded to the estate its present assets, restoring to it a very substantial portion of the assets which appeared to have been lost. As the successful opposition to the receivers' proposal of settlement may be said to have resulted in a preservation of the fund, so the negotiation of the last settlement may be said to have brought it into court.

Compensation, then, in connection with those two problems is properly payable.

But where several persons were engaged in doing the same work, there can be no duplication of pay. The court looks at the service as a unit. Therefore if several solicitors render services in the same identical connection, the total of their compensation should not exceed what would be a fair allowance for a single solicitor who had done all the work. In such case duplication should be avoided by splitting the fees among those engaged in the common work according as their respective contributions of effort would suggest. *In re Coney Island Lumber Co.*, (*D. C.*) 199 *F*. 197;

*In re Felson,* (*D. C.*) 139 *F.* 275; *In re Eureka Upholstering Co.,* (*C. C. A.*) 48 *F.* (Bd) 95. This principle is particularly applicable with respect to the proceedings in opposition to the settlement negotiated by the receivers in 1934, when solicitors representing two different stockholders' committees and another solicitor representing stockholders, all appeared and actively engaged in the opposition.

Before taking up the various petitions for consideration, it would appear to be in order at this point to make a brief statement of facts relating to the settlement approved May 29, 1936, which·yielded to the receivership the major portion of its present estate. The statement is rather one of theories which explain the settlement's consummation. There were several factors which probably induced the Columbia companies to enter into the settlement. The first was of course the assertion of a claim for damages in a large amount in the receivers' suit against the Columbia interests in the federal court in New York. Secondly, there was a pending suit by the United States Government against the Columbia companies to enjoin those companies under the anti-trust laws from exercising their control over the Panhandle Eastern Pipe Line Company in which they had invested a large sum of money. Thirdly, the securing for the benefit of Panhandle Eastern Pipe Line Company of a profitable contract to supply the City of Detroit with gas after an extension of its line, was a factor which undoubtedly played an important part in the situation. That contract promised to solve the problem of markets for Panhandle Eastern gas which had caused such bitter conflict between Mokan and Columbia. It also made an adjustment of Columbia's differences with the federal government highly desirable·to the end that Columbia might be undisturbed by a government suit in its enjoyment through Panhandle Eastern of the benefits of the Detroit contract. Before the government would consent to a decree in its favor, however, it insisted that Columbia should submit to the receivers of Mokan a *bona fide* offer of settlement of the

controversy existing between them and Columbia. Lastly, the rejection by this court of the compromise proposed by the receivers in May of 1934, may have had some effect upon the attitude of the Columbia group towards a compromise that yielded to Mokan substantial terms, because such rejection served to emphasize in a very emphatic way the fact that the complainants against them were not to be compensated for on the theory of their having a mere nuisance value.

To what extent these several factors played a part as inducting causes which led Columbia to enter into the compromise, it is impossible for any one other than those who were the spokesmen for the Columbia companies to say. Some of the claimants for compensation stress one factor and some another; and each is quite positive in asserting that his own particular efforts in any one connection were particularly influential in determing the final outcome.

With respect to the first factor just mentioned, the assertion of the claim in the New York federal court, no one is entitled to be compensated therefor except the special counsel, Mr. Schechter, who took the case on a contingent basis, and the receivers.

With respect to the second factor, *viz.*, the government anti-trust suit, several of the claimants claim to have rendered services for which this receivership should compensate them. It would be highly improper, not to say presumptuous and offensive for this court to assume that the United States government in its anti-trust litigation was acting as an auxiliary to this court's receivership in its endeavor to build up an estate to be administered. Yet it seems to me that some of the claims for compensation require in the last analysis that such an assumption, to an extent at least, be made. A great deal has been said by some of the claimants about their various calls at the Department of Justice, the information they communicated to the department and the advice they gave it—all designed to show valuable services rendered to this receivership. I have no

doubt that the department obtained valuable information from all the sources available to it, whether gratuitously supplied or otherwise. No doubt some of the claimants here volunteered to the department both suggestions and information. But that the government suit was a mere tactical adjunct to this receivership and that its prosecution was either shaped or guided by unofficial persons acting in behalf of this receivership, is a suggestion which no one would be so bold as openly to avow. I give no countenance whatever to it, and I am prompted in a way to apologize to the able lawyers in the department for even mentioning the subject. I do so only because of the necessities which the statements made by some of the claimants for compensation have thrust into the discussion. If, as is contended, some of these claimants were of service to the government in its suit, I am unable to see the principle which would justify this court in appropriating the funds belonging to the stockholders of this corporation in payment for those services—services which neither this court nor its receivers either authorized or sought.

With respect to the third factor, *viz.*, the negotiation of the Detroit contract, no one is claiming compensation on account of that. As a matter of fact it has already been paid for in the amount of one hundred and twenty-five thousand dollars by the Columbia companies.

With respect to the last factor, *viz.*, the rejection of the settlement negotiated by the receivers, payment for services in connection therewith should be made as already indicated.

I now address myself to the various claims as briefly as possible.

1-5. These claims are for compensation to the receivers, Mr. Bush, of Wilmington ($50,000.00) and Mr. Phillips, of Chicago ($180,000.00), their general counsel, Marvel, Morford, Ward and Logan ($150,000.00) to Borders, Borders and Warrick, Kansas City, Missouri ($150.00 and expenses of $13.50), and to Henry Wagstaff

Ryan, New York City ($1,000.00 less a credit of $500.00 and expenses of $52.40). The two last named claims will be allowed.

As to the receivers and their general counsel, it must be manifest that they cannot expect to be paid as much for their services as they would otherwise be entitled to if the settlement which they negotiated in 1934 had not been brought forward. Their counsel stated that they have given weight to this consideration in fixing the amount of their requests. I do not think they have taken it sufficiently into consideration. They undoubtedly believed in the wisdom of the settlement in the light of the then appearing facts. The objectors with whom the court agreed, thought otherwise. The outcome has shown the receivers and their counsel to have been unwise in their recommendation. The estate was put to an expense by reason of the lengthy controversy over the merits of that settlement. Had it not been for the necessity of that contest, the basis for some of the allowance herein made would not exist.

Yet the labor spent in negotiating the settlement that was rejected cannot be regarded as destitute entirely of some value to the estate, for the reason pointed out above when the various factors contributing possibly to the final result were enumerated. A less expensive way, however, of disclosing to the Columbia interests that the claim against them would be seriously pressed could of course have been found. If the rejection of the receivers' settlement had any effect upon the Columbia state of mind, it was not because the settlement was devised for the purpose.

The receivership has extended over a period of four and one-half years. There were only three occasions, however, when its problems were acute and called for other than routine activity; and so far as I can discover the long periods of quiet between the acute occasions, were in the main largely periods of resting on the oars. I have already adverted to the critical problems of the receivership. With respect to the first, the foreclosure suit, the receivers and

their counsel were active and effective. With respect to the second, the settlement they negotiated, I cannot overlook the fact that their activities ran the estate to an expense. With respect to the third, the final settlement, the receivers had no part in the highly important work of its negotiation in the original form. After its submission they did succeed in improving its terms to a substantial extent. If Panhandle Eastern stock has the value claimed for it by the receivers, they assert that the money value of the improvements obtained by them is as much at least as six million dollars.

Mr. Phillips is admitted to have devoted very much more of his time to the receivership than did Mr. Bush. He was not employed otherwise, devoting most of his time to the receivership. A larger allowance to him is therefore justified and is conceded by his co-receiver. In view of all the circumstances I am of the opinion that thirty-five thousand dollars should be allowed to Mr. Bush, seventy thousand dollars to Mr. Phillips and ninety thousand dollars to the counsel for the receivers. These allowances will cover the work yet to be done which is not inconsiderable and very important.

6. The firm of Schechter, Cutler, Salzberger and Mc-Mahon, of New York City, special counsel, seeks an allowance of five hundred and fifty thousand dollars as a fee and $6,386.90 as reimbursement of expenses. Mr. Schechter of this firm was in charge of the work for which compensation is sought. It was himself and not his firm, whom the receivers were authorized to employ. He was engaged as special counsel to conduct the litigation in the New York federal court in which treble damages under the anti-trust laws were sought to be established by the receivers against Columbia. Another like suit was pending in New York against certain other companies which had been instituted before the receivership by Mokan, and which the receivers thereafter undertook to carry on. Mr. Schechter was engaged to conduct the proceedings in that suit also. His employment was on a contingent basis. The receivers were not

in possession of funds with which to defray the ordinary expenses of the litigation. Mr. Schechter was to bear all the expenses. If the cases resulted in recovery either as a result of trial or of settlement, he was to be paid such sums as a fee as the Chancellor might allow. If the cases yielded nothing, he was to be paid nothing. Mr. Schechter did considerable work in preparation for trial. The final settlement, however, was not negotiated by him. He had no participation in it. He contributed to it in no way except insofar as the pendency of the suit he was conducting and his activties in connection therewith may be said to have operated as one of the contributing or inducing causes of the settlement. The fact must not be overlooked that regardless of what he may receive as a fee out of the settlement with the Columbia group, that is to say out of the present assets, his right to demand compensation out of the other suit for services rendered therein remains undiminished. The work he did in the two suits necessarily overlapped to a very large extent. If the present settlement had been arranged by him, the amount of his compensation would be largely increased over what I am disposed to allow him. The situation is not one where his services as a skilled negotiator are to be compensated for. The case is one where another person stepped in and accomplished the final result towards which the suit he was conducting was directed. I realize that Mr. Schechter took what if I may be pardoned the use of the expression, was a gambling chance. He risked his time, labor and his out-of-pocket expenses against a possible nothing. While this consideration entitles him to more liberality of compensation than would otherwise be the case, yet it does not entitle him to an extravagant fee. The sum of five hundred and fifty thousand dollars which he asks is out of all reason. He states that, counting a working day as eight hours, he spent three hundred and seventy-five days of work upon the problems before him. That means three thousand hours. In addition he states that several associates and assistants in his office spent

"hundreds of days" at work with him. In the case of *In re Paramount-Publix Corp.*, (*D. C.*) 12 *F. Supp.* 823, an eminent firm of lawyers was allowed compensation in a reorganization proceeding at the rate of six dollars and twenty-five cents for each hour spent by the members of the firm and their assistants. At that rate Mr. Schechter's individual pay would be eighteen thousand, seven hundred and fifty dollars. How much would be added for his associates and assistants at the same rate cannot be calculated. "Hundreds of days" is very indefinite. But it would be manifestly unfair to base Mr. Schechter's allowance on a *per diem* rate. That is for the reason that he was engaged on a contingent basis. He took the chance of receiving nothing in the way of a fee and of losing his expenses and disbursements. I will allow him one hundred thousand dollars and his expenses of $6,386.90.

His request of five hundred and fifty thousand dollars is based on a calculation of five per cent of the alleged recovery which he estimates at eleven million dollars. If Mr. Schechter had had some intimacy of association with the final settlement his claim to be compensated would be greater than it is, though I think even then his figure of five hundred and fifty thousand dollars would be gravely debatable. I think I am quite fair to him in making the allowance above stated.

7 and 8. The petitions under these numbers are filed by Thurlow G. Essington, ancillary receiver in the United States District Court for the Northern District of Illionis, and his counsel, Messrs. Glenn, Real and Browning. Their requests are for forty thousand dollars to Mr. Essington subject to a credit of fifteen hundred dollars, and fifty thousand dollars, subject to a credit of thirty-five hundred dollars, and $586.19 for expenses, to his counsel. These amounts were, I beleive, approved by the United States District Court in Illionis. I regret that I feel impelled to decline to accept the approval of that court as persuasive. The allowance of Mr. Essington and his counsel should be

brought somewhere within reasonable relation to the allowances made to the receivers and their counsel in this, the primary jurisdiction. Most of the work of the receivership, so far as its final outcome is concerned, was conducted by the receivers here. The principal if not the only substantial contribution which the ancillary receiver and his counsel made to the problem of the estate's administration by this court, consisted in their active participation in the adjustment of the foreclosure difficulties, before referred to. The ancillary receiver asserted claims for damages against the former directors of Mokan and instituted suit therefor. He also engaged in other legal proceedings in Indiana. Those activities were under the direction of the court appointing him. Their net result is the possession by the ancillary receiver of $13,525.34, for which he is of course accountable to the Illionis federal court.

The ancillary receiver was not a party to the 1934 settlement agreement which was rejected by this court. He did however present the same to the Illionis court for its approval or rejection. The ancillary receiver's counsel stated in their petition to the Illionis court for allowances that their client, the ancillary receiver, did not approve the settlement. He never indicated, however, that he disapproved it. His counsel represented him at the hearings in this court when the advisability of the proposed settlement was undergoing lengthy examination. At no time did he through his counsel express disapproval or criticism of the proposal. Under the circumstances, I am of the opinion that the Chicago receiver and his counsel cannot entirely dissociate themselves from responsibility for the advocacy of that proposal. Their presentation of it to the Chicago court and their failure or refusal to criticize it in this court, must, in view of their official connection with the receivership, be taken as showing their silent assent, to its acceptance. That settlement, if it had been authorized, would have left little for the creditors and nothing whatever for stockholders, after the receivers and their counsel had been

compensated. I cannot overlook that fact in passing upon the question of allowances to the Chicago receiver and his counsel any more than I can overlook it in passing upon the allowances to the Delaware receivers and their counsel. It seems to me that the ancillary receiver and his counsel owed to the very critical question then under consideration something more than an attitude of indifference.

I am of the opinion that twenty thousand dollars (less the credit of fifteen hundred dollars) is all, that should be allowed the ancillary receiver out of the fund in this jurisdiction. A like sum should be allowed to his counsel, less the credit of thirty-five hundred dollars. The expenses of the counsel should be paid in Illionis.

9. The New York Stockholders' Protective Committee petitions for an allowance of seven hundred and fifty thousand dollars as compensation and $71,750.83 as expenses. In point of fact, however, the expenses incurred by that committee, if the lawyers and engineers and secretary it employed (whose claims are hereinafter passed upon) are paid what they ask for, should be increased by $230,145.16. (Strictly speaking the committee rather than those whom it employed, should be the petitioner for allowances with which to pay the latter, because the charges of the latter are allowable only as they qualify as compensable expenses of the committee which engaged the services. But I overlook this technical criticism, treating the several petitions of the committee's agents as though they were presented by the committee for reimbursement of expenses incurred.) The total expense occasioned by the committee thus appears to be $1,051,897.99, including compensation to itself.

The committee was formed on October 30, 1932. As originally composed, it consisted of Robert W. Woolley, Franklin B. Richards, and A. P. McManus. The last named withdrew soon after the committee was formed and Hubert H. Howard took his place. Messrs. Richards and Howard performed no services worth mentioning beyond allowing

the use of their names. Mr. Woolley was the chairman of the committee. The members of the committee were stockholders. Mr. Woolley bought one hundred shares of stock before going on the committee. He later purchased one thousand shares, presumably, considering the market, at a very nominal sum. Richards owned three thousand shares. Howard owned five thousand shares. The only stockholders who subscribed to the agreement setting up the committee were W. G. Maguire to the extent of seventy-three thousand shares, W. G. Maguire & Co., Inc. (Mr. Maguire's personal company), to the extent of fifty thousand shares, S. P. Staton to the extent of twenty thousand shares and Francis I. du Pont to the extent of thirty thousand shares. Mr. Maguire owned other shares in addition to those mentioned above. A master's report recently filed in a cause in the Circuit Court of Cook County, Illinois, which has been placed in evidence, shows him to be entitled to at least twenty-six thousand, six hundred and sixty-six additional shares. Maguire thus was a stockholder directly and indirectly in the total apparently of at least one hundred and forty-nine thousand, six hundred and sixty-six shares. He also was a creditor with others of the insolvent company, asserting a claim for about six hundred thousand dollars, which was eventually settled by the receivers agreeing to allow the claim in the amount of one hundred and sixty thousand dollars. S. P. Staton was associated with Maguire in a secretarial capacity.

The committee agreement by its terms was to expire on one year from its date unless extended by consent of the committee and assenting stockholders. It was authorized to incur expense not in excess, however, of ten cents per share of stock held by the subscribing stockholders.

The evidence shows that the committee was formed on the initiative of Maguire. He selected its membership. He was exceedingly active in everything the committee did. No member of the committee, other than Woolley, exhibited any effort in behalf of the stockholders it represented.

Maguire because of his prior connection with Mokan had a very intimate acquaintance with its affairs. He supplied the committee with the knowledge he had and devoted his time in generous measure to a solution of the insolvent's problems. Excepting Parish, the insolvent's president, no one was possessed of the information regarding the details of its past history and the ramification of its problems, which Maguire possessed and, with like exception, no one was more active and persistent in his efforts to work something out of the sorry situation. Maguire became finally designated by the committee as its executive assistant. He was as ubiquitous as Parish whenever anything in court or out of court, anywhere, was stirring of interest to the estate.

Without in anywise meaning to detract from the standing or dignity of the committee, I cannot escape the conclusion that it was a Maguire committee, instigated by him in its formation and very much influenced by him in its activities. The stockholders who authorized the committee to act, were with the exception of du Pont, a Maguire group. Mr. du Pont withdrew from the arrangement, as I recall, after he sold a large block of his stock at public auction. Thereafter, the committee and all of its depositing stockholders were distinctively of Maguire complexion.

I mention the foregoing facts, not at all in disparagement of the committee, but solely to emphasize the point which seems to me to be clear, *viz.*, that the committee was formed in the interest of Maguire's stake in the corporation. Its activities were very largely the personal activities of Maguire, its executive assistant.

The committee proposed, if its claim is allowed, to apply forty per cent thereof to Maguire. That would mean that through the committee he would receive three hundred thousand dollars as personal compensation for doing work that was in his own interest as a creditor and large stockholder. Clearly, to the extent that Maguire would personally share in the allowance, none would be justified. The general

principles hereinbefore stated deny to him the right to compensation for personal services or expenses. So likewise must the committee be denied similar compensation, for as before stated the committee, being but an agent for stockholders, must expect its claim for allowance to be tested by the same principles which would be applied if the stockholders had themselves done the committee's work. Any obligation that the committee incurred to save, protect or create the common fund, should be borne by the fund. Compensation for personal services or reimbursement of personal expenses that are not directly related to any of these ends, cannot be allowed. The committee must look to its principals for personal compensation.

The result is the very disappointing one to the committee and one that the court finds it unpleasant to announce, *viz.*, that the committee's claim must be disallowed.

10, 11, 12, 13 and 14. The petitions under these designations are filed by persons who claim to have rendered compensable services to the estate on the engagement of the New York Stockholders' Committee. Richard B. Hand of New York, general counsel for the committee, asks a fee of one hundred and twenty-five thousand dollars and a reimbursement of expenses in the amount of $6,845:42; John Biggs, Jr., Delaware counsel for the committee, asks a fee of twenty-five thousand dollars and $872.38 for expenses; Joseph V. McCabe of New York, counsel for the committee, asks five thousand dollars for a fee and $197.53 for expenses; Brokaw, Dixon and McKee, engineers and technical advisers of the committee request sixty thousand dollars as compensation and $4,729.83 for expenses; and I. A. Theiss, who served as secretary of the committee, requests compensation of twenty-five hundred dollars.

Under the principles I have hereinbefore laid down for guidance, these requests cannot be allowed unless the services which the committee asked the claimants to perform, either created or preserved the common fund. If any part of the services falls out side the limits of that descrip-

tion, the claimants must look for compensation therefor to the committee.

The committee has described the work which it did as divisible into six phases. These are

(a) Steps in 1933 to prevent the foreclosure and its incidents before referred to.

(b) Steps to procure active prosecution of the anti-trust suit pending when the receivers were appointed.

(c) Steps to institute and procure active prosecution of a conspiracy suit by the receivers against the Columbia interests. (This was the suit which this court authorized to be settled on April 29, 1936.)

(d) Opposition to the agreement of settlement with the Columbia interests which the receivers submitted in 1934.

(e) Steps to have instituted and actively prosecuted the suit of the United States against the Columbia interests.

(f) Steps to oppose the settlement of 1936, to prevent the receivers from being persuaded to accept it and to secure a better offer, resulting in the amended offer of April 22, 1936.

The services rendered by the petitioners grouped under the present heads, were spread over all of these matters. As to (a), the receivers had the duty of looking after that matter and did it quite competently. Their action was approved by the court. Those who did work in opposition to them (some of the claimants) can hardly claim to be paid. As to (b), I do not think the committee's agents are entitled to compensation for prodding the receivers. As to (c), the same observation applies. As to (d), compensation is undoubtedly due to those of the petitioners immediately associated with that particular phase of the estate's problems. As to (e), I am unable to see on what principle this estate should compensate for that activity. I have at an earlier stage of this discussion commented on that aspect of the matter. Finally as to (f), I am of the opinion that Mr. Hand is the only one of the petitioners under the

present head who can be compensated in that connection. The receivers made use of his services and his offices as headquarters in their negotiations with the Columbia people for a betterment in the terms of the offer which, as improvingly modified, was finally accepted. To that extent he is entitled to be paid. No others are entitled to be paid in that connection.

The opposition which was interposed to the receivers' settlement agreement of 1934 was productive of highly important results. That opposition, which was successful, may be truly described as protecting and preserving the fund. Mr. Hand took the leading part in it. He is entitled to substantial compensation. For his services in that connection and in connection with the negotiation of improved terms in the final settlement, I think he is entitled to one hundred thousand dollars, less a credit of $2,092.48. I am unable to tell how much of his expense of $6,845.42 is allocable to the two phases above mentioned. I shall allow him all of the amount, however, because I feel that no injustice will be done the estate if the fee allowed him is increased by some items of expense which as such may not be strictly allowable.

As to Mr. Biggs, his efforts appear to have been as the local associate of Mr. Hand. The latter, however, did by far the bulk of the work. I shall allow him five thousand dollars and expenses of $176.69. This is all the expense I can discover under liberal examination to be properly allocable. It is expenses incurred in 1934 which I am allowing *in toto*.

Mr. McCabe's services to the committee commenced on May 23, 1936, subsequent to the termination of all the six phases of the committee's efforts above mentioned. Those services are described by him as follows: conferring with the committee on steps to be taken to conclude its work, conferring with the receivers and their counsel; arranging to secure a list of stockholders; attending a hearing in Chicago (which I may say the receivers were looking after) ; preparing the committee's petition for allowances;

and finally he desires to be compensated for attending the hearing on the petitions for allowances and for circularizing the stockholders regarding their rights to subscribe for stock. I am of the opinion that none of these services can be charged against this estate. They are referable rather to the individual interests of the persons for whom the committee had engaged to act. The claim will be disallowed.

Brokaw, Dixon and McKee, engineers and technical advisers to the committee, seek compensation for services rendered to the committee extending over a period of three years and seven months, from September, 1932, to and including April, 1936. The range of their activities was spread over a wide and varied field. The only connection in which their services are chargeable against the estate under the general principle I have accepted as the guiding rule, is that which has to do with the receivers' proposal of settlement in 1934. That phase of the case was, as frequently already stated, a saving and protecting one. The firm of engineers rendered valuable services in that connection. They spent a total of seventy-one days in direct and immediate work in that connection. They state that their *per diem* charges range from one hundred dollars to two hundred dollars per day for members of their firm. The larger figure appears to me to be a rather high one. I am going to accept it, however, in this case, because of the fact that it would appear that they brought into the seventy-one days of work the result of labors spent outside of that period which, if it had not been spent, would have been required of them to some extent in the immediate connection. This may be stretching a point. But I think it is justified under the circumstances. The claimants will be allowed fourteen thousand, two hundred dollars as compensation. They ask for expenses of $4,729.83. An examination of their schedule of expenses shows only $365.38 of expenses during that period. That sum will be allowed.

Miss I. A. Theiss requests twenty-five hundred dollars

as secretary to the committee. She was Mr. Hand's secretary, regularly employed. As secretary to the committee, her services are not shown to have been such as are chargeable to the estate. Her claim will be disallowed.

15 and 16. These petitions are by members of a committee known as the Chicago Stockholders' Protective Committee, who ask for ten thousand dollars as compensation and $684.83 for expenses, and by the law firm of Montgomery, Hart, Pritchard and Herriott, counsel for the committee, who ask a fee of thirty thousand dollars and a reimbursement of expenses in the amount of $534.79.

The committee states its right to be compensated in exceedingly general terms. All that has been said in reference to the New York Stockholders' Committee applies with added force to the Chicago committee. The committee's petition will be denied.

The firm of lawyers engaged by it filed an answer to the receivers' petition for authority to enter into the proposed settlement agreement of 1934, objecting thereto. For reasons heretofore stated, this is the only matter in connection with which the petitioning lawyers may be properly compensated by the estate. As to other activities they must look to their clients. The New York committee had filed an objecting answer and had already taken out a commission for the taking of testimony in opposition to the receivers' application of 1934, eight days before the Chicago committee's answer was filed. Mr. Herriott of the petitioning firm attended the hearing on the receivers' petition. He remained, however, only a day or so. His part in the proceedings was a minor one. I think it fair to say that Mr. Hand decidedly took the laboring oar throughout the hearing, ably seconded by Mr. Wagner of Chicago who represented a few individual stockholders, who had been organized by Parish into the so-called Berg Stockholders' Committee. Why Mr. Herriott abandoned the hearings, I do not know. I cannot see that his services at the hearings were other than filing an opposing answer and attending for about two

days. Other parties were active and vigorous in contending with the receivers and if Mr. Herriott did anything in an active way it was only, so far as I am able to judge, in duplication of work which he abandoned to others to carry forward. I conclude that no allowance should be made to his firm. It mjust look to its clients for compensation.

17. This is a petition similar to the petition of Montgomery, Hart, Pritchard and Herriott, but with less of a showing in its support. The petitioner is L. W. Linville, attorney for a Colorado Stockholders' Protective Committee, who asks for six thousand, six hundred dollars as a fee and $1,346.36 to cover expenses. The petition will be disallowed.

18. Petition of James M. Malloy, solicitor for the so-called Berg Stockholders' Committee. The request is for fifteen hundred dollars. Mr. Malloy acting for Mr. Wagner, filed an answer for his clients in opposition to the receivers' suggested settlement of 1934. I find that he secured an order for the taking of a deposition in support of the objections. I think he should be allowed two hundred and fifty dollars.

19. Colony Realty and Investment Company has requested payment to it of $24,247.42 for reimbursement of expenses made by it in rendering aid to Warrick in his negotiations with the Columbia companies which led to the final settlement. The services consisted of studies and analyses of the operations of Mokan and other corporations, accounting studies, consultations and advice. Warrick in his petition makes no mention of the assistance claimed to have been rendered to him by this petitioner. The services as claimed were rendered by Mayo and Hartman, an officer and employee of the petitioner, and by the accounting firm of Ralph B. Mayo and Company, which is but another name for Mayo. The petitioner was and is the owner of forty thousand shares of the common stock of Mokan and a creditor in the claimed amount of ninety thousand dollars. The cost to it of the services of its own officer and employee

in seeking to produce a favorable outcome of the receivership is in the category of the personal expenses of a party in interest and is not chargeable against the estate. The petition will be denied.

20 and 21. The petitions under these numbers are by White and Case, a firm of New York lawyers and by Richards, Layton and Finger, of Wilmington,. Delaware, who acted locally for White and Case. White and Case ask for a fee of seventeen thousand, five hundred dollars, less a credit of seven hundred and fifty dollars, and Richards, Layton and Finger ask for two thousand, five hundred dollars as a fee. These two firms represented Colony Realty and Investment Company, mentioned in the next preceding paragraph.

Their claims arise in this way. When Warrick negotiated the settlement which, after improvements, was finally accepted, he submitted it to the receivers who on January 31, 1936, refused to recommend it. After the receivers rejected the offer Warrick secured its resubmission by Columbia. He and Parish engaged White and Case, who in turn engaged Richards, Layton and Finger, to take proceedings in this court designed to compel the receivers to accept the offer. On the same day, *viz.*, March 9, 1936, two petitions in substantially the same form were filed, both seeking the same relief, namely, an order directing the receivers to accept Columbia's offer of settlement. One petition was by Parish and Warrick, and was filed by Richards, Layton and Finger and Warrick as solicitors. The other was by sundry creditors and stockholders of Mokan and was filed by Richards, Layton and Finger and White and Case. White and Case were in charge of the matter. These petitions brought the offer before the court and eventuated in the court's approving a final settlement of all the insolvent's controversies with Columbia.

The petitions were not difficult ones to draw. They stated in substance that an offer of settlement had been secured, a copy of which was attached, that the receivers

had refused to accept it and concluded with a prayer that the court notify the receivers and all parties in interest that a hearing would be held on a day certain to determine whether the receivers should be required to accept the offer. Warrick had done all the preliminary work extending over some months and the result of his labors was embodied in a written offer which he placed in the hands of the lawyers to be presented to the court. At the hearing, it was Warrick and not the petitioners who took the lead in supporting the advisability of accepting the offer. This was natural, because he was full of the subject and knew its remotest details.

I think that the solicitors are to be compensated only for the work of shaping the mechanics whereby the settlement was brought before the court and all parties in interest duly notified. Some additional compensation should be allowed them for the time spent in familiarizing themselves with the broad outlines of the problem. But that cannot be much, because they did not need to go beyond Warrick to learn all that was necessary for their purposes.

I am of the opinion that three thousand, five hundred dollars is ample for White and Case and five hundred dollars for Richards, Layton and Finger.

22 and 23. These are petitions respectively by Monroe Percy Bloch, of New York, attorney for Frank P. Parish, and others, who asks for thirty-five thousand dollars as a fee and an allowance of $741.63 as expenses; and by Gilbert F. Wagner, of Chicago, attorney for Parish, Missouri-Kansas Pipe Line Company and the Berg Stockholders' Protective Committee, who asks for a fee of one hundred and twenty-five thousand, eight hundred dollars, and an allowance of $1,918.93 as expenses.

What I have said in connection with other claims presented by lawyers representing committees is in large part applicable to these gentlemen. Bloch had no compensable connection with any of the critical junctures when the fund was either in course of protection or creation. He

appeared at the hearing in 1934 to oppose the receivers' proposed settlement arrangement. When he announced that he represented the insolvent company, I declined to recognize him. His employment as the solicitor for the company had not been authorized by the court. He claims to have rendered other services in behalf of this estate, unidentified with the 1934 settlement. Such services were engaged by Parish, the president of Mokan. Parish had no authority to commit the company, while in receivership, to Bloch's employment. Parish acted in his individual capacity in employing Bloch, and he paid Bloch in Mokan stock—seven thousand, three hundred and thirty-three shares, having a present value of between sixty-two and sixty-six thousand dollars. There is no occasion for this court to make him an allowance.

Wagner did appear at the important hearing in 1934, and remained throughout its duration. He filed a lengthy brief after the record of the testimony was completed. The receivers' petition asking the court to approve the settlement was filed on May 23, 1934. Objections thereto were ordered to be filed not later than June 21, 1934. Mr. Hand in behalf of the New York Stockholders' Protective Committee filed objections thereto on June 13, 1934, and prepared for the hearing. The hearing came on, after being adjourned, in September, 1934. Wagner then appeared for the first time and filed belated objections which consisted of an adoption of those presented by Hand. While I agree that Wagner's participation in the opposition to the proposed settlement was of value to the estate, I do not think it is to be regarded as equal to that of Hand. After the contest with the receivers was concluded, Wagner's compensable connection with the estate, unlike Hand's, ceased. There is the matter, too, of Wagner's having received from Parish, who enlisted his services in connection with Mokan's general affairs, an assignment in May of 1935 of Parish's title to six thousand shares of Mokan stock in part consideration at least of Wagner's services. A master in

the Circuit Court of Cook County, Chicago, Ill., recently found in favor of Wagner as the rightful owner of those shares. If he finally receives them, he will have received in stock, taking it at the latest quotation of nine dollars per share, fifty-four thousand dollars. He did not perform the services that Hand did in aid of the receivers in negotiating an improvement of the offer of 1936. Besides work in connection with opposing the 1934 settlement, he claims to have done other important work for the benefit of the estate. Parish and the Berg Stockholders' Protective Committee engaged him. Parish paid him a fee, being the assignment of Parish's title to stock above referred to. I think an allowance of thirty thousand dollars more from this estate is ample. An inspection of his expense account shows the sum of $280.70 to be attributed to his attendance at the 1934 hearing. Expenses in that amount will be allowed.

24. Dupuy G. Warrick, attorney for Parish and others, petitions for an allowance of two hundred and fifty thousand dollars as compensation and $7,883.14 as expenses. This claim is based on Warrick's services in negotiating the settlement with the Columbia companies in 1936. The solicitors for the receivers contend that as the settlement which was finally approved was not the one Warrick negotiated, it cannot be said that Warrick negotiated any settlement that the court should recognize. This is thoroughly technical. The settlement which was finally approved was the Warrick settlement with some improving modifications which the receivers succeeded in having added to it. The substance of the settlement was the result of Warrick's work. There may have finally been a settlement negotiated by some one if Warrick had never busied himself in behalf of the stockholders. It has been said by some one in the course of these proceedings that events had so shaped the Mokan-Columbia situation that a settlement was inevitably bound to emerge in due time. Perhaps so. Such things however are not self-creative. Someone must bring them forth. No one other than Warrick addressed his efforts to the culmi-

nating task. While others were standing by, Warrick was active. He accomplished the result. He is entitled to substantial compensation. I shall allow him one hundred and twenty-five thousand dollars as compensation and expenses as asked for in the sum of $7,883.14.

25, 26, 27, 28 and 29. This group embraces claims for services rendered to Frank P. Parish, president of Mokan. They are for consulting engineering services, secretarial work, and the services of public relations counsel. None of them should be allowed. Aside from other considerations, it is enough to observe that all the services were rendered to Parish in a very important personal connection.

30. This is a claim by Sabath, Pearlman, Goodman and Rein, attorneys of Chicago. The claim is for a fee of ten thousand dollars and expenses of $1,174.32. I believe the claim is one that was settled before a master in Chicago agreeably to the receivers. It will be allowed.

31. White and Hawxhurst, attorneys in Chicago, seek an allowance of a fee of ten thousand dollars and expenses of $254.87. When the receivers presented to this court their proposal of settlement in 1934, it seems that some of the parties in interest became alarmed by the fear that this court would approve the settlement. As the sequel showed, this alarm was unjustified. But to make certain that the Chancellor could not, even if so disposed, approve the settlement, creditors were secured to institute proceedings in the federal court in Chicago under *Section 77B* of the *National Bankruptcy Act,* in the hope that the federal court would take jurisdiction over the corporation and thereby terminate the Chancellor's jurisdiction in receivership. White and Hawxhurst filed the petition under *Section 77B.* Their labors were expended in seeking to destroy the receivership. They can hardly be described as persons who worked for its benefit. Their claim will be disallowed.

32. Finally, Thomas F. Wickham seeks twenty-one thousand, two hundred dollars as compensation for his alleged employment by one of the receivers to sell natural

gas to the City of Indianapolis, I heard his testimony and that of the receiver in reply. I find that the receiver never employed him. This claim will be disallowed.

Order in accordance with the foregoing.