JOSEPH W. PERRINE and JULIA A. PERRINE,

*vs.*

THE PENNROAD CORPORATION, a corporation of the State of Delaware, THE PENNSYLVANIA RAILROAD COMPANY, a corporation of the Commonwealth of Pennsylvania, WILLIAM W. ATTERBURY, EFFINGHAM B. MORRIS, JAY COOKE, LEVI L. RUE, RICHARD B. MELLON, ALBERT J. COUNTY, HENRY H. LEE, JOSEPH WAYNE, JR., and A. H. S. POST; and EFFINGHAM B. MORRIS, WILLIAM M. POTTS and JOSEPH WAYNE, JR., AS VOTING TRUSTEES UNDER VOTING TRUST AGREEMENT DATED MAY 1, 1929, IN RESPECT OF THE COMMON STOCK OF THE PENNROAD CORPORATION, a corporation of the State of Delaware.

*New Castle, February 17, 1947.*

*John J. Morris, Jr.,* of the firm of Hering, Morris, James & Hitchens, and *Daniel W. Blumenthal,* of New York City, for Stockholders' Protective Committee.

*Leo Brady,* of Gordon, Brady & Keller, of New York City, (Stewart Lynch of the firm of Lynch & Herrmann, of counsel), for petitioners Leo Brady, Stewart Lynch, Joseph B. Keenan, Gordon, Brady & Keller, and Feldman & Barrett.

*James H. Hughes* for petitioners, Milton I. Milvy, Max Terry and James H. Hughes.

*Morris Wolf,* of Philadelphia, Pa., for Pennroad Corporation.

*William A. Schnader, Alexander Conn,* and *Charles E. Kenworthey,* all of Philadelphia, Pa., and *Robert H. Richards, Jr.,* of the firm of Richards, Layton & Finger, for petitioner Frank M. Swacker.

*James R. Morford,* of the firm of Marvel and Morford, for Daniel O. Hastings, in opposition to petition of Frank M. Swacker.

SEITZ, Vice-Chancellor. This is the decision of the court with respect to certain petitions for allowances based on alleged compensable services rendered in the so-called Pennroad-Pennsylvania Railroad litigation. The court is also required to determine whether an alleged agreement between two of the attorneys—with respect to a division of their fees—is here enforceable.

Before entering into a discussion of the various petitions, I should like to point out that the right to compensation does not flow automatically from the performance of services in cases of this type, no matter how substantial and meritorious the services may have been. In order to be compensable, the services must meet the requirements laid down in certain principles of law which attempt to reward initiative without unduly dissipating the subject matter of the litigation. *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569.

### Petition and Supplemental Petition of Stockholders' Protective Committee of Pennroad Corporation

The Stockholders' Protective Committee of Pennroad Corporation (hereafter called Committee) has filed two petitions requesting compensation and reimbursement for expenses incurred in connection with the Perrine litigation in this court resulting in a court approved settlement of $15,000,000. The Committee requests allowances aggregating $150,000.

Clarity can best be served by first setting forth the nature of the services rendered by the Committee and its attorneys and then considering the applicable principles of law.

This Committee was organized early in 1932 for the purpose of taking measures to protect the interests of all stockholders of Pennroad Corporation, and of redressing in so far as possible the stockholders' grievances against Pennroad Corporation, its management, and the Pennsyl-

vania Railroad Company. The Committee was created at the behest of Mr. Louis Straus, an associate of L. F. Rothschild and Co., who represented the owners of substantial amounts of Pennroad stock. The Committee represented prominent stockholders owning in their own right or representing considerable stock interests in Pennroad. The foregoing facts are alleged in the petition filed by the Committee.

The Committee's petition sets forth the work done in connection with the examination of the Pennroad Corporation's organization and early operation, but it appears from the petition and also from the evidence that the information and knowledge gleaned from the Committee's activities were not passed on to complainants or their solicitors prior to the filing of the Perrine suit in this court. Indeed, the testimony of one of the attorneys for the Committee indicates that for purposes of the decision on this petition it may be said that no work was done by the Committee before the institution of the Perrine suit. The petition recites that thereafter (apparently after the Perrine suit was filed) the attorneys for the Committee, namely, Maurice B. and Daniel W. Blumenthal, were often in touch with Frank M. Swacker, Esquire, of New York City, who was then the principal solicitor for the complainants in the Perrine suit. The petition relates that all the information gleaned from the work of the Committee and its attorneys was made available to Mr. Swacker. However, there is no allegation in the petition, nor was there any evidence before me which indicates that Mr. Swacker needed this information or that the information was valuable and supplemented information otherwise known or available to him.

The petitions and evidence demonstrate that the Committee was not particularly active aside from keeping in touch with the Perrine litigation in this court, and answering certain requests for information.

The vagaries of the Perrine litigation become important. The suit by the Perrines against the Pennroad Cor-

poration and various individuals was filed in this court on October 18, 1932. Thereafter, various dilatory motions and procedural problems slowed the progress of the case. See *Perrine v. Pennroad Corporation,* 19 *Del.Ch.* 368, 168 *A.* 196; *Id.,* 20 *Del.Ch.* 106, 171 *A.* 733. This period (1932-1939) constitutes one of the two periods of time during which the Committee allegedly rendered services for which it here requests compensation.

The *Perrine* case was far from being ready for trial in 1939. Meanwhile, two suits were filed in the United States District Court for the Eastern District of Pennsylvania, which I shall refer to as the *Overfield-Weigle* suits. In these suits, the plaintiffs sought redress for much the same wrongs as were involved in the *Perrine* suit. These suits were subsequently tried and a judgment was entered for approximately $22,000,000, which judgment was reversed on appeal. See *Overfield v. Pennroad Corporation, et al.,* (3 *Cir.*) 113 *F.2d* 6; *Id.,* (*D.C.*) 39 *F.Supp.* 482; *Id.,* (*D.C.*) 42 *F.Supp.* 586; *Id.,* (*D.C.*) 48 *F.Supp.* 1008; *Id.,* (3 *Cir.*) 146 *F.2d* 889. However, the reversal of the judgment was based solely on the ground that the applicable Pennsylvania statute of limitations had run against the claims. Rather than continue the struggle, the Pennsylvania Railroad Company offered to settle the Perrine litigation in this court for $15,000,000, in such a way as to dispose of all the so-called Pennroad litigation including the *Overfield-Weigle* suits. In 1945-1946, the settlement was approved by this court, *Perrine v. Pennroad Corporation, et al.,* 28 *Del. Ch.* 342, 43 *A.* 2d 721, and such approval was affirmed on appeal to the Supreme Court of Delaware. *Perrine v. Pennroad Corporation et al., post p.* 531, 47 *A.* 2d 479, *certiorari* denied by the United States Supreme Court January 20, 1947, 67 *S. Ct.* 620. On February 17, 1947, a decree dismissing the bill with prejudice was entered conditioned upon the filing by the Pennroad Corporation of evidence of receipt of the amount of the settlement.

The Committee does not claim any compensation arising out of any services rendered in the *Overfield-Weigle* litigation.

The second period of time covered by the Committee's claim involves the years 1945-1946 when the offer of settlement was tested in this court and the Supreme Court. The Committee through its attorneys examined the offer and concluded that it was fair under the facts and applicable law. One of its attorneys appeared on certain days at the hearing on the approval of the settlement and conducted a limited examination of certain witnesses. The Committee's attorneys also supported the proposed settlement and recommended its approval both orally and by brief. Subsequently, the Committee caused briefs to be filed in and argument to be presented to the State Supreme Court which looked toward the approval of the settlement.

Are the Committee's services during the two periods mentioned legally compensable from the settlement fund? The answer requires a statement of principles governing the rights of a stockholders' committee to be paid and the rights of those performing services for such committee to be paid. This court had occasion in *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569, 576, to consider at length the principles of law governing our general situation. I take the liberty of quoting what I consider to be the important language of that opinion in so far as the first period covered by the present application is concerned.

"It is not often that creditors or stockholders undertake individually to engage in activities in behalf of a receivership administration. The usual and familiar procedure is for a few persons to organize themselves into a committee to represent the interests of a common class. Now the right of such committees to be compensated cannot in reason rise to any higher dignity than can the right of the individual creditors or stockholders whose agents they are. This was held to be the rule in *Penington v. Commonwealth Hotel Construction Corporation*, 18 *Del. Ch.* 238, 158 *A.* 140. Voluntary committees who are mere agents of creditors or stockholders are entitled

to be compensated and only in the same degree as their principals would be, that is to say, only to the extent that they have incurred expense in the business of creating or preserving the common fund. Any expenses they have incurred in other connections as for instance in watching the progress of the administration, conferring with the receivers, gratuitously advising them and assuming generally to act as overseers of the receivers, cannot be compensated for out of the estate. Such activities and the expense incident thereto, unless they result in a very material and demonstrable sense in either creating or preserving the fund, must be paid for by the group whom the committee represents.

"In the case of In re Paramount-Publix Corporation, supra [D. C., 12 F. Supp. 823], it was said that where a court has appointed receivers in an insolvency proceeding who are represented by competent counsel, there is ordinarily 'no room for independent participation in the administration of the estate and any one who, without court authorization, performs administrative services, no matter how meritorious, or incurs expense, must look solely to his own clients for payment.' See also In re New York Investors, (2 Cir.,) 79 F. 2d 182.

\* \* \* \* \*

"So likewise must the committee be denied similiar compensation, for as before stated the committee, being but an agent for stockholders, must expect its claim for allowance to be tested by the same principles which would be applied if the stockholders had themselves done the committee's work. Any obligation that the committee incurred to save. protect or create the common fund, should be borne by the fund. Compensation for personal services or reimbursement of personal expenses that are not directly related to any of these ends, cannot be allowed. The committee must look to its principals for personal compensation.

\* \* \* \* \*

"Under the principles I have hereinbefore laid down for guidance, these requests cannot be allowed unless the services which the committee asked the claimants to perform, either created or preserved the common fund. If any part of the services falls outside the limits of that description, the claimants must look for compensation therefor to the committee."

Based on the above quoted principles of law, it is the conclusion of this court that the activities of the Committee during the first period (1932-1939) are not properly compensable out of the fund here involved, because such services

and expenses were rendered or incurred through its attorneys in watching the progress of the litigation, conferring with the solicitor for complainants, and conveying some of this information to those who were interested enough to write the Committee. From a reading of the petitions and the testimony of the secretary of the Committee, as well as the testimony of the attorney for the Committee, I am clearly of the opinion that the activities of the Committee during the first period mentioned, and the expenses incident thereto did not "result in a very material and demonstrable sense in either creating or preserving the funds." The Committee was formed or controlled by substantial stockholders who were using this instrumentality to protect their investments, and the Committee as such must look to its principals for compensation. *Veeder v. Public Service Holding Corporation, ante p.* 396, 51 *A. 2d* 321. We are not here concerned with a case where the litigation was either conducted or controlled by stockholders who were unable or unwilling to prosecute the litigation vigorously and skillfully. At best, under the circumstances, the Committee's efforts amounted to supererogation.

The Chancellor in *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.,* 21 *Del.Ch.* 308, 190 *A.* 569, recognized the possibility that a person might at the request of a stockholders' committee render services for which he should be compensated from the fund involved. However, the test of the right of such a claimant to compensation from the fund is this: The services rendered at the Committee's request must have resulted [at least in part] in the creation or preservation of the common fund, otherwise the claimant must look to the committee for compensation.

Treating Maurice B. and Daniel W. Blumenthal, the attorneys for the Committee, as claimants who performed services at the request of the Committee, did such services during the first period here involved result, even in part, in the creation or preservation of the fund here involved?

In reality, the services of the Committee were almost entirely the services of the Blumenthals because it is apparent from the testimony that they were the Committee in so far as its activities were concerned. The secretary of the Committee formerly worked for the Blumenthals and later was employed by them as secretary of the Committee. The office of the Committee was in their suite of law offices and their names appear prominently in practically all publicity in connection with the Committee's work. Since I have concluded that the Committee's services during the first period were not a proper charge against the fund, I necessarily find that the services of its attorneys, who were in fact the Committee, are not compensable therefrom. These services, whatever their merit, did not to my mind aid in the creation or preservation of the common fund within the meaning of that principle as enunciated by this court in *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.,* 21 *Del.Ch.* 308, 190 *A.* 569.

For the reasons just stated, I also conclude that the services rendered by Eva P. Seaver, secretary of the Committee, are not compensable from the fund. She must look to the Committee for compensation.

The second period of time during which services were rendered for which the Committee and its attorneys desire compensation from the fund involves the years 1945-1946. The services consist entirely of supporting the settlement of the Perrine litigation through examination, argument and brief in this court and the Supreme Court. Are such services compensable from the fund? The answer to this question requires some discussion of the settlement proceedings.

Initially, it is clear that neither the Committee nor any of its agents or attorneys took any part in negotiating the settlement. Its request for compensation for the 1945-1946 period (the claim of the Committee, its agents and attorneys are here considered collectively because under the facts

and applicable law they must stand or fall together) is based, therefore, solely upon its activities in the judicial proceedings to approve the settlement. Are such services compensable under the attendant facts? I think not for the reason that they duplicated the efforts of the corporate directors, officers and attorneys who espoused the settlement in the proceedings in this court and in the Supreme Court of Delaware.

The Committee, throughout the proceedings to approve the settlement, contended that the directors and officers of the corporation and its attorneys were acting in good faith and in the best interest of the corporation in recommending the approval of the settlement. Moreover, this court and the Supreme Court of Delaware in approving the settlement apparently concluded that the corporate officials did represent the corporation adequately and in good faith in recommending the settlement. Under such circumstances, the Committee's efforts at best amounted to a duplication of the services of those who had a legal duty with respect to such matters. The Committee is not entitled to be paid from the fund for such services under the circumstances.

A similar conclusion was reached by this court in *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569, 584, where certain individuals asked compensation for services rendered the receivership estate on the engagement of a stockholders' committee. The services there consisted of taking steps to prevent the loss of receivership assets through a foreclosure proceeding. Ultimately, the receivers procured a settlement whereby the corporation received substantial benefit. The individual claimants asserted that their activities had aided in procuring the settlement, and in denying their claims this court said:

"* * * As to (a), [claims based on activity of individuals in preventing foreclosure and procuring settlement] the receivers had the duty of looking after that matter and did it quite competently. Their action was approved by the court. * * *"

Since the receivers — who were charged with the duty to protect and preserve the corporate assets — performed their duty, the court held that others who actively supported them could not thereby become entitled to compensation from the fund. By parity of reasoning, it seems clear that the Committee here and its agents and attorneys cannot look to the fund in payment for their services in supporting the corporate officials during the judicial hearings on the approval of the settlement. The services of the Committee, its agents and attorneys duplicated those of the corporate officials, and they performed no service which substantially supplemented the case presented by the corporate officials as a basis for judicial approval of the settlement.

Since I have concluded that the services rendered by the Committee and its agents and attorneys, where otherwise valuable to the corporation in these proceedings, duplicated those of persons charged with the legal duty to perform such services and who did in fact perform such services, neither the Committee nor its agents or attorneys are entitled to any compensation from the fund created by the settlement of this litigation. This type of litigation must be sharply distinguished from reorganization proceedings where different problems and principles are often involved. See *Veeder v. Public Service Holding Corporation, supra.*

Petition and Supplemental Petition of Leo Brady, Stewart Lynch, Joseph B. Keenan, the firm of Gordon, Brady & Keller and the firm of Feldman & Barrett.

I now consider the petitions of Leo Brady, Stewart Lynch, Joseph B. Keenan, the firm of Gordon, Brady and Keller, and the firm of Feldman and Barrett for the allowance of attorneys' fees and reimbursement for expenses. Petitioners request attorneys' fees in the amount of $100,-000, plus such additional amount as the court may see fit to give them for their work in unsuccessfully prosecuting their appeal to the Supreme Court of Delaware. They also seek reimbursement for expenses incurred by them aggregating

approximately $3,000. By consent of the other parties, the claim of Joseph B. Keenan, belatedly asserted, is being treated as a part of the petitions of the other parties. Since no objection was made to this procedure, I shall assume its regularity for purposes of this decision. I shall refer to all these attorneys seeking compensation as "petitioners."

All the petitioners represented stockholders who objected to the approval of the settlement agreement by the court. One somewhat unusual aspect of the case is the fact that the surviving original complainant in the action objected to the settlement through her attorney Joseph B. Keenan, who became her attorney at the time of the institution of the settlement proceedings in this court.

It will be assumed that all the petitioners acted in good faith in opposing the approval of the settlement, and it will be further assumed that all the petitioners are men of ability who presented their objections to the settlement in a more than capable fashion.

The sole question for determination is whether attorneys representing stockholders who opposed without any success the judicial approval of a settlement of a stockholders' derivative action are, nevertheless, entitled to compensation from the settlement fund.

It is doubtless true as a general principle that in stockholders' derivative actions attorneys are to be compensated from the fund to the extent and only to the extent that the services they performed created or preserved the common fund and did not duplicate the efforts of those legally chargeable with the performance of such services, and who performed them. See *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569. Petitioners concede that their efforts in unsuccessfully opposing the approval of the settlement did not create or preserve the fund from which they desire to be compensated. The petitioners' position is that this court has the power to make an allowance to them, and that this power should be exer-

cised in favor of granting an allowance because petitioners by presenting the "other side" enabled the court to arrive at an intelligent determination of the matter.

Petitioners contend that the power to grant compensation to them in this case is given by *Paragraph* 4907 of the *Revised Code of Delaware* 1935, which provides:

"4907. Sec. 6. Courts of Equity, Register's and Orphans' Courts; Superior Court Upon Appeals from Such Courts; Orders for Costs in:—A Court of Equity, the Register's Court, the Orphans' Court, and the Superior Court exercising appellate jurisdiction from the two last mentioned Courts, shall make such order concerning costs in every case as shall be agreeable to equity."

I take it, however, that this statute is not determinative of the issue as to whether or not these petitioners should be compensated from the fund. This court must still decide whether the allowance of an attorney's fee to each of these petitioners would be agreeable to equity. Compare *Kennedy v. Emerald Coal & Coke Co.*, 27 *Del. Ch.* 55, 30 *A. 2d* 269.

Petitioners further state that their position "is no different from that of counsel for an unsuccessful litigant in a will contest." They cite cases in this jurisdiction and elsewhere which doubtless allow attorneys' fees to unsuccessful litigants in will contest cases. However, I do not believe this case is comparable for present purposes to a will contest case. I so conclude because in a will contest case the fund exists, and it must be decided to whom it belongs as between adverse claimants. Here the petitioning attorneys unsuccessfully opposed the very creation of the fund. Moreover, the legal dispute arising from the effect of a paper purporting to be a will calls for the assertion of personal rights by the claimants while in a derivative action the unsuccessful litigant is comparable to one who has lost a personal action against the corporation.

Aside from the differences stated, however, it must be recognized that the court is required in this situation to

lay down a rule of fairness and convenience. Some of the implications flowing from the adoption of any particular rule may be visualized even on the judicial plane. The rule to be adopted should retain the incentive to oppose judicial approval of settlements felt to be inequitable or unadvisable. However, to grant compensation from a fund to unsuccessful opponents of the settlement would be tempting human nature unduly. I agree with counsel for the corporation that "the efforts of counsel in cases of this kind are inherently subject to the contingency of success in creating benefit for those whom counsel asks to pay him."

The case of *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569, 577, appears to be direct authority for the proposition that petitioners are not entitled to compensation. There, certain persons unsuccessfully opposed the settlement of a foreclosure suit in the Illinois Federal Court which settlement resulted in a substantial benefit to the corporation. These same persons thereafter filed a claim for compensation based on such unsuccessful activity. In denying compensation, this court said:

"In connection with this settlement, some of the claimants other than the primary and ancillary receivers and their counsel, claim to have rendered services for which they should be compensated. Their services consisted in opposing the settlement. After hearing, their objections were overruled by the court. I think nothing should be allowed as compensation for services in that connection other than to the receivers in the two jurisdictions and their counsel."

The court in *R. H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569, 578, had occasion to consider also the application for compensation made by certain persons who successfully opposed another settlement. Of these parties, the Chancellor said:

"In view of this situation, it is clear that those parties in interest who incurred expense in successfully opposing the settlement negotiated by the receivers, may be very properly described as having done so in the course of preserving the common fund for the bene-

fit of all who were interested therein. Reimbursment should be allowed for that expense."

See also *Thomas v. Peyser*, 73 *App.D.C.* 155, 118 *F.2d* 369, 373.

Petitioners failed when the touchstone was success. Petitioners say in effect that their services in unsuccessfully opposing the settlement constituted a negative catalyst which prevented fraud and assured the court that all facets of the settlement would be presented. This very argument was presented to the court in *Thomas v. Peyser*, 73 *App. D.C.* 155, 118 *F.2d* 369, 373, by certain attorneys who sought compensation for unsuccessfully opposing certain steps in a reorganization. Of this argument, the court said:

"* * * As we have said, these [services for which the attorneys sought compensation] were chiefly in the nature of opposition to various steps taken in the course of the administration. Appellants' theory is that their efforts in this respect have acted as a negative catalyst to prevent fraud in the reorganization. Perhaps a vigilant opposition may be admitted to have a beneficial effect in these matters as in others, by inducing caution in administration. But absence of it raises no presumption that due care will not be exercised, particularly when, as here, the administration is directly under the supervision of the court. Rather the presumption is to the contrary. The inference of benefit is therefore highly speculative, in the absence of a showing of some successful challenge to proposed action which increases the fund or protects it from loss."

Doubtless the petitioners aided the court in arriving at its conclusion, but that may be said of most attorneys representing losing causes. If refusal of compensation here can be said to discourage the proper policing of corporate affairs it must also be recognized that the rule which authorizes compensation only in the event of success strikes a balance between opposing interests. Moreover, experience has demonstrated that the contingent fee arrangement has not discouraged litigation unduly and the analogy is not too remote.

The petitioners rely heavily on the case of *Penington*

*v. Commonwealth Hotel Construction Corporation,* 18 *Del. Ch.* 238, 158 *A.* 140, 141. The *Penington* case involved the question of the proper construction of the corporation's charter in order to determine the correct basis for distributing the assets in dissolution. The fund already existed and the case involved a dispute between classes of shareholders as to how it should be distributed. Thus, the *Penington* case involved an "interest in a fund" and representation of a class. It is analogous to the situation presented in a will contest, rather than in a stockholders' derivative action. It might be noted also that the Chancellor in deciding the *McWilliams* case, cited the *Penington* case and yet apparently did not consider it in any way inconsistent with his holding in the *McWilliams* case that attorneys unsuccessfully opposing a settlement are not entitled to be compensated from the fund. Moreover, I see no inconsistency between the holdings in the cases, but without regard to precedent, it is my conclusion that success is the *sine qua non* of the right to be compensated from the fund for services performed in opposing judicial approval of a settlement in this type of action. Since this success is lacking in the petitioners' case, they are not entitled to be compensated from the fund for either their fees or expenses.

I should perhaps note that the petitioner Joseph B. Keenan, although the attorney for the complainant, was only employed in connection with the settlement proceedings. Ordinarily in derivative actions the attorney for the complainant is entitled to compensation, but here the petitioner's activities as attorney for complainant consisted only of unsuccessfully opposing the settlement. Such services obviously did not aid in the creation or preservation of the fund. The petitioner Keenan's claim must fall along with those of his fellow petitioners.

Petition of Milton I. Milvy,
Max Terry and James H. Hughes

We come now to the petition of Milton I. Milvy, Max

Terry and James H. Hughes for counsel fees and expenses of $10,000. These gentlemen represented Norman C. Norman, a stockholder who intervened in this litigation in 1933.

The services for which compensation is requested are limited. First it is stated that the petitioner Milvy brought suit in Norman's behalf against the Pennroad Corporation in New York, but that the suit was discontinued for lack of jurisdiction. Since this did not contribute in any tangible way to the creation or preservation of the present fund, such action cannot form the basis for compensation here. Compare *Thomas v. Peyser*, 73 *App.D.C.* 155, 118 *F.2d* 369.

It is stated that the petitioner Milvy caused Norman to intervene in this litigation and that he investigated the questions involved in preparation for trial. Further, it is averred that in 1940 the petitioner Terry (the petitioner Hughes appeared some time later) appeared in the cause and spent time examining the questions involved and in preparing for a hearing, and that all the petitioners kept in contact with the so-called *Overfield-Weigle* suits in the federal court in Philadelphia.

Without discussing the matter at length, it is the conclusion of this court that the activities relied upon by petitioners are not compensable from the fund under the facts and law of this case. There is no showing that petitioners performed actions which materially aided in the creation or preservation of the fund. The fact that petitioners represented an intervener is not sufficient where there is no showing that during the period in question the activities of the intervener materially supplemented those of the complainant. Moreover, the undisputed evidence shows that this litigation lay dormant from 1941 to 1945 when the settlement proceedings arose.

Finally, petitioners rely on their activities in recommending the judicial approval of the settlement. Without discussing what these activities were, it is only necessary to point out that under my ruling in connection with the pe-

titions of the Stockholders Protective Committee such activities are not compensable from the fund where they, at best, duplicate the efforts of those charged with the legal duty to present the facts with respect to the merits of the settlement, and where both this court and the Supreme Court apparently found that the corporation properly discharged its duty in that respect. Additionally, it is conceded that petitioners had no part in negotiating the settlement itself.

Under the facts as I find them and the principles of law which I think applicable, these petitioners are not entitled to be compensated from the fund for either their fees or expenses.

### Petition of Frank M. Swacker and Answer of Daniel O. Hastings

The petition of Frank M. Swacker requests this court to retain jurisdiction of the settlement fund and to "make an allowance to petitioner and Daniel O. Hastings, as counsel for the Complainants, as well as allowances to any others entitled thereto upon proof satisfactory to this Court that such additional allowances should be made; and that thereupon this Court shall award to Petitioner one-half of the fee to be allowed to Petitioner and Daniel O. Hastings, as counsel for Complainants." The petitioner's request that he be allowed one-half of the fee awarded to the petitioner and Hastings as counsel for complainants is predicated on an alleged subsisting agreement between Hastings and Swacker that they would divide the fee on such basis. This court authorized Hastings to file an answer to the petition and in such answer Hastings denies that the alleged agreement is subsisting, and contends that Swacker is entitled only to reasonable compensation from the settlement fund for services actually rendered by him.

In order to understand the problem and to arrive at a proper basis for its solution, it is necessary to narrate at length the facts as I find them from the testimony and exhibits adduced by the parties at the hearing.

The petitioner Swacker is a New York attorney whose skill, qualifications and experience in the type of litigation involved in this case entitle this court to conclude, and I do conclude, that he was one of the outstanding attorneys in this field.

Late in 1930 Swacker was approached by J. Markham Marshall, another New York attorney, who introduced him to Marshall's client, one Kenneth S. Guiterman, who in turn asked him whether he would undertake a suit on a contingent basis on behalf of the Pennroad stockholders against the Pennsylvania Railroad and its directors. Swacker agreed to do so. However, Guiterman was not a stockholder of Pennroad at the time of the commission of the wrongs complained of, and in order to avoid any question he, Guiterman, procured his relatives, the Perrines, to act as complainants and agreed to indemnify them against any disbursements or costs.

Swacker first brought suit in New York in January, 1931, but this action was limited to the so-called Pittsburgh and West Virginia transaction. The action collapsed when the trial court quashed the service on the Pennroad Corporation on the ground that it was not doing business in New York. The Appellate Court affirmed this decision. After his failure in New York, Swacker spent some time considering what other forum to select and finally decided to file suit in this court.

Swacker in the early summer of 1932 employed the firm of Richards, Layton and Finger as local counsel in Delaware, and after redrafting his bill of complaint so as to include many more of the major transactions in which Pennroad participated, he filed a bill on behalf of the Perrines on October 18, 1932. Swacker's name appears on the bill and he was admitted *pro hac vice*. At that time and until March 5, 1935, Swacker employed in his office on salary one Hugh F. O'Donnell who did much work on the Pennroad litigation. When O'Donnell began to practice on his own

after March 5, 1935, he continued to work on the Perrine case under an agreement with Swacker whereby he would be compensated contingently from Swacker's share at $100 per day, but, as ultimately agreed, the aggregate compensation to him was not to exceed ten per cent of the whole fee allowed to the complainants' counsel.

Since it is not involved in the dispute, I shall not discuss the arrangement between Swacker and Richards, Layton and Finger. In June 1936, Richards, Layton and Finger, due to a conflict of interests, withdrew as local counsel, and I conclude from the record that the services rendered by Richards, Layton and Finger are for present purposes to be credited to Swacker.

After the withdrawal of Richards, Layton and Finger, Swacker engaged Daniel O. Hastings as local counsel. Swacker and O'Donnell conversed with Harry Lunger, who was then associated with Hastings, and as a result a letter dated May 29, 1936, was written by Swacker to Lunger which reads in part as follows:

"We would be glad to make an arrangement with you if you are available and agreeable to going into the matter in either of two ways, that is, we to continue to do the principal work in the case and your firm attending to the necessary Court appearances and the trial, or, you to take active charge of the litigation, we according you such assistance as we can or upon such other bases as you suggest; and upon such agreement as we may reach for an equitable distribution of the fees."

To this letter, Hastings, Stockly and Duffy, by Mr. Lunger, replied by letter dated June 1, 1936, as follows:

"I think the best arrangement for the present time is that you and Mr. O'Donnell should continue to carry the burden of the case and rely upon this firm for court appearances, formal matters and future hearings. We desire, if agreeable to you, to take over where Mr. Finger of Richards, Layton & Finger withdraws. It may be that at a later time it might be desirable for us to take a more active part in the litigation and if such circumstance arises, I am sure that we can make proper arrangement. For the present, my understanding is that we have the case on a contingent basis with one-third interest."

The next development of importance occurred December 21, 1936, when Lunger wrote a letter under that date to Swacker containing the following language pertinent to this matter:

"I am very pleased to inform you that Senator Hastings has concluded to take an active part in this litigation. If agreeable to you, we will plan a conference shortly after the holidays. I am afraid that the delay is due to my inability to find time enough to digest the material which you recently sent to me."

Following this letter, Swacker and O'Donnell came to Wilmington toward the last of January, 1937 and had a long conference with Hastings, at which time they discussed the entire matter. At that time, Swacker and Hastings orally agreed that the estate of J. Markham Marshall (he died in the summer of 1936) was entitled to receive from five to ten per cent of the aggregate fee, and that the balance would be divided equally between Hastings and Swacker.

Swacker contends that they also decided that each would pay from his own share for any one he would bring into the case to assist him. Hastings says the point was not discussed. Hastings contends that they agreed to share the work practically equally. Swacker says that the agreement contemplated that each would do "what might most naturally fall to us to do."

The matter "rocked along" until the spring of 1938 when a disagreement arose between Swacker and his real client Guiterman. This disagreement resulted in letters to Swacker from Guiterman and Joseph W. Perrine, one of the complainants, which I construe to constitute a dismissal of Swacker as their attorney in the suit in this court. Swacker appears to concede that he was thereby effectively discharged as the attorney for the Perrines.

Up to this date (March 1938) Swacker and Hastings were, for our purposes, in complete agreement. Hastings testified that he made the oral agreement relied upon by Swacker, namely, an even division of the fee of the counsel

for complainants after a five or ten per cent payment to the Marshall estate. The question of the apparent division of opinion as to the services to be rendered by the parties under the agreement will be discussed hereafter. To reiterate, there is no dispute as to the relations existing between Swacker and Hastings from the date of the making of the written agreement in 1936 until Swacker was discharged by his clients in March 1938.

The principal question is whether, despite the discharge of Swacker by Guiterman and the Perrines plus Swacker's subsequent conduct, the oral agreement between Swacker and Hastings which replaced the written agreement is subsisting and enforceable. Swacker says "yes" and Hastings says "no."

I shall first discuss just what the oral agreement contemplated by way of performance, and then consider whether the agreement as interpreted was so performed by Swacker as to entitle him to the relief requested.

The oral agreement between Swacker and Hastings was that the local and foreign counsel would prosecute the case on a fifty-fifty contingent arrangement subject to a five or ten per cent payment to the Marshall estate. As to this, the parties are in complete agreement. However, Hastings claims that the parties agreed to "divide the work practically equally." Swacker says that each would do "what might most naturally fall to us to do." The parties make much of the seeming conflict in the testimony as to this most material term of the agreement. I think the conflict is more apparent than real.

When we consider these two versions of the performance phase of the agreement, it becomes apparent that the work could be divided practically equally, and yet each party would be doing what fell most naturally to him to do. Thus, the conflict would be of words only. However, if it can be said that the testimony of the parties is in conflict, then I

conclude that Swacker's expression as to what was contemplated more accurately verbalizes the understanding between the parties with respect to the services to be rendered by each under the agreement. The nature of the agreement and the situation of the parties, as well as the not unusual nature of such an arrangement in the legal profession, constitute the bases for my conclusion.

However, it is not dispositive of this phase of the case to conclude, as I have done, that the oral agreement between Swacker and Hastings contemplated that each would do "what might most naturally fall" to each to do. We must attempt to penetrate the verbal screen and see—in so far as the nature of the subject matter may permit—what was the actual activity reasonably expected by each party of the other party to the agreement. In order to isolate this expectation, it is necessary to discuss the parties and their activities as well as certain phases of this litigation.

When Hastings replaced Richards, Layton and Finger as local counsel, pursuant to letter dated June 1, 1936, it was agreed that Swacker and O'Donnell "should continue to carry the burden of the case" and rely upon the Hastings firm "for court appearances, formal matters and future hearings." Under this arrangement, the Hastings firm was to handle the case "on a contingent basis with one-third interest."

The June 1, 1936 agreement contained a recognition of the possibility that another agreement might be made, since it was stated therein that if Hastings decided to take a more active part, a proper arrangement could be made. Lunger, on behalf of Hastings by letter dated December 21, 1936, advised Swacker that Hastings had decided "to take an active part" in the Perrine litigation and suggested a conference to work out a proper arrangement. The proper arrangement entered into in late January, 1937 turned out to be the oral agreement here involved.

The June 1, 1936 agreement between Swacker and Hast-

ings typified a well recognized, arrangement between attorneys whereby the "out-of-town" counsel carries the burden of the case and the "local" counsel makes available his knowledge of local rules of pleading and procedure, and takes care of the formal matters involved in the litigation, such as signing and filing pleadings, attending court, etc.

I shall assume, as is doubtless the case, that Swacker was perfectly capable of "pulling the laboring oar" in this litigation. Although some attempt is made to belittle Swacker's services and judgment, it is based for the most part on hindsight and I do not take it too seriously. From June 1, 1936 to the latter part of January, 1937, when the written agreement was in effect, Swacker pulled the laboring oar. The only formal actions indicated by the docket entries of this court during the period mentioned involved the withdrawal of Richards, Layton and Finger as counsel, and the entry of an appearance by Lunger, presumably on behalf of Hastings, plus six stipulations of counsel for extension of time for the return of a commission to take testimony. The documentary evidence introduced by Swacker at the hearing (it was indicated that all the documents material to the issues were being offered) indicates that during this short period from June of 1936 to the end of January, 1937, Swacker was attempting to work out a stipulation of certain facts with the attorneys for the defendants in the Perrine litigation in order to abbreviate the proof. Most of the correspondence during this period is taken up with the procuring of the stipulations for extensions of time, which I have already mentioned. From the evidence covering this period, I conclude that Swacker was carrying the principal load in the case, and Hastings' office was merely acting as local counsel in accordance with their agreement.

We come now to the period from late January, 1937 until March, 1938, during which period Swacker and Hastings acted under the oral agreement whereby Hastings was to take an active part in the litigation, and they were to

divide the fee equally after making a percentage payment to the Marshall estate. What services did Swacker and Hastings perform during this period when they were operating under the agreement which Swacker contends is a subsisting agreement? Their activities during this period may throw some light on the proper interpretation of the performance phase of the agreement because such activities took place at a time when the parties were not in disagreement.

The docket entries of this court during the period from late January, 1937 to March of 1938 are as follows:

"Feb. 19, 1937—Application for the issuance of a commission to take testimony without the State of Delaware, on behalf of the complainants, filed.

"Feb. 19, 1937—Commission issued and sent by registered mail to Commissioner named in foregoing order.

"April 7, 1937—Stipulation of counsel for extension of time for return of commission, filed.

"April 28, 1937—Commission to Ernest H. Pendell, returned, filed and published."

The documentary evidence introduced by Swacker demonstrates to me that during this period he and O'Donnell were very active in the preparation of certain phases of the case. Without overburdening the opinion with detail on this point, it is sufficient to point to Swacker's letter to Lunger dated March 23, 1937, as a typical example of the type of activity engaged in by Swacker under the oral agreement. Generally speaking, Swacker and Hastings and their associates were each doing what fell naturally to each to do. However, and of importance, Swacker was doing and causing O'Donnell to do substantial amounts of work on the case, and Hastings, although doing substantial work at his end, was also relying heavily on Swacker.

Swacker and Hastings operated under the oral agreement here involved for a period of approximately fourteen months (from late January, 1937 to March, 1938) and dur-

ing this time both parties did a substantial amount of work under the agreement by way of legal research and pursuit of possible evidence. During this period Swacker and Hastings were operating under their oral agreement and they were in entire accord. Therefore, while not conclusive, their activities during this period in doing what would naturally fall to each to do, indicate what was expected of each party under the agreement. In Swacker's case he and his associate O'Donnell contributed a substantial amount of time and effort to the prosecution of the Perrine litigation. This contribution by Swacker conforms with my conclusion that Swacker, under the oral agreement, was to perform substantial services in the prosecution of the case. Such a conclusion is reasonable when we consider that the fee was to be divided equally and Swacker, who was one of the outstanding trial lawyers in the country in this type of litigation, intended to act as trial attorney in the Perrine case.

It is my conclusion that the oral agreement contemplated and contained as one of its essential terms an understanding that each party thereto would, throughout its existence, render substantial and continuous contributions to the prosecution of the case. The performance to be rendered by each party to the agreement constituted in my opinion the real consideration for the agreement. The question now is whether Swacker rendered to Hastings the consideration in the form of services which I have concluded was required of him by the agreement.

Let us return to the chronological narrative of the evidence. As stated, Swacker's clients Guiterman and Perrine discharged him as their attorney in March, 1938. At this time, O'Donnell was working with Swacker on the Perrine case under a separate contingent agreement with Swacker. Swacker took the position, which he still maintains, that Guiterman and Perrine had no authority to discharge him as to the body of the shareholders on whose behalf the derivative action was brought. I am unable to understand Swacker's theory on this point. These other unidentified

stockholders had no personal agreement with Swacker. Moreover, his only connection with them arose out of his representation of a stockholder who had seen fit to discharge him as attorney. Swacker was in the luckless state of an attorney without a client. I do not see how Swacker became forever appended to the litigation as counsel merely because he was once attorney for the complainants in the class action.

The testimony indicates that Guiterman and consequently Perrine, desired Hastings and O'Donnell to continue in the case. Swacker testified that he agreed to let Hastings and O'Donnell continue in the case subject to the limitation that they would take no steps materially "affecting the policy of what might be done with respect to the litigation without first conferring" with him. Assuming, without deciding, that Swacker sought to impose such a condition, and further assuming that he had a legal right to impose such a condition, nevertheless, the existence of such a condition does not indicate that he was continuing to act under the oral agreement with Hastings. In fact, the imposition of the condition indicates that Swacker was withdrawing at least from active participation in the case. Indeed, he concedes that his activities were substantially less after his discharge by Guiterman and Perrine. As a matter of fact, Swacker's own activities in the Perrine case after March of 1938 were negligible. He took no part in the Overfield-Weigle trials in Philadelphia. Swacker's contention that O'Donnell's services after March of 1938 are to be considered as having been rendered by Swacker will be discussed later. The facts of this case impel me to conclude that after March, 1938 Swacker failed to perform the services which were required of him by the oral agreement with Hastings, and as a consequence, there was a material failure of consideration on his part unless he can gather unto himself the benefit of O'Donnell's services.

Failure of consideration is, of course, a well recognized

defense in an action seeking to enforce an agreement. In 1 *Restatement of the Law of Contracts*, § 274, it is stated:

"(1) In promises for an agreed exchange, any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional. An immaterial failure does not operate as such a discharge.

"(2) The rule of Subsection (1) is applicable though the failure of performance is not a violation of legal duty.

\* \* \* \* \*

"Comment on Subsection (2):

"c. The law excuses a contracting party from performing his promise for a variety of reasons—infancy, insanity, impossibility caused in certain ways; but however blameless in law and fact a party to a contract may be in failing to perform his promise, if he does fail he should not have what is promised in exchange for his performance."

See also 3 *Williston on Contracts*, (*Rev.Ed.*) § 814.

Swacker attempts to credit as performance by him under the oral agreement the work done by O'Donnell after March of 1938, which work was substantial and continued up until the settlement of the case. While it is true that O'Donnell made use of some of Swacker's material, I do not believe that this fact is inconsistent with a conclusion that there was a failure of consideration on the part of Swacker in the case of his agreement with Hastings. In view of Swacker's discharge by Guiterman and Perrine, and the subsequent direct hiring of O'Donnell by Guiterman, with Swacker's consent, I cannot see how O'Donnell's efforts can be said to have been performance by Swacker under his agreement with Hastings. The services rendered by O'Donnell after his direct hiring by Guiterman with Swacker's consent were not rendered pursuant to the separate agreement between Swacker and O'Donnell and were not so understood or intended by the parties. I further conclude from the evidence that O'Donnell's services were not rendered as performance under the Swacker-Hastings agreement, and

it was so understood by all parties. Certain evidence which showed the mixed feelings of O'Donnell as a consequence of his understandably awkward position resulting from his direct employment by Guiterman is not to my mind in any way decisive of the Hastings-Swacker controversy. To epitomize, O'Donnell's services cannot be used by Swacker to show performance of the Hastings agreement by him.

I must advert to one other matter. After Swacker's discharge, he brought a *quantum meruit* action for $300,000 against Guiterman in New York, basing his cause of action in part on his activities in Guiterman's behalf in the Pennroad case. This case is, as I understand it, still pending pursuant to stipulation of counsel to await the outcome of this litigation. The parties naturally place different interpretations on this action as it relates to the merits of the Swacker-Hastings controversy here. This action by Swacker is susceptible of so many inferences and explanations that I prefer not to give it any great weight in arriving at my decision. However, I do feel that it indicates along with the other evidence that Swacker after his discharge in 1938 took a somewhat different view of his future position in the Perrine litigation, and consequently of his relations with Hastings.

Other events subsequent to Swacker's dismissal by his clients will be treated only in a general way. The Perrine case was still not ready for trial in 1939. During this year, the so-called Overfield-Weigle suits were filed in the federal court in Philadelphia. These suits covered substantially the same subject matter as was involved in the Perrine case. Although Hastings and O'Donnell took part in the progress of the Overfield-Weigle suits along with several other attorneys, they apparently were also moving the Perrine case toward trial so that both were being prepared for trial in 1941. However, Judge Welsh insisted that the Overfield-Weigle cases be tried, and as a consequence, the Perrine case gathered dust while the Overfield-Weigle cases wended their way to ultimate defeat in the Circuit Court of Appeals under

circumstances which I shall not pause to repeat. It should be added, however, that a great amount of work in the preparation of the Overfield-Weigle cases for trial was done in the relatively short period after the cases were set for trial. Swacker had nothing to do with the Overfield-Weigle cases, except for certain conversations with O'Donnell and the use by O'Donnell of some of Swacker's material. This cooperation by Swacker is understandable because he hoped to procure an allowance in the federal court if the Overfield-Weigle suits culminated successfully. Such cooperation in my opinion was not rendered pursuant to any agreement between O'Donnell and Swacker.

As already stated, the Pennsylvania Railroad decided to settle all the Pennroad litigation. The now aged Perrine case was resurrected and used as the vehicle by which the settlement was to be effectuated. Further events leading up to the present controversy need not be recited, except to indicate that Swacker was particularly active during the trial of the Overfield-Weigle cases in an attempt to procure from Hastings a firm commitment as to what his compensation would be in the event the Overfield-Weigle suits were successfully concluded.

Swacker emphasizes that at all times after his discharge by Guiterman and Perrine his activities were consistent with the continued existence of the Swacker-Hastings agreement. The vice in this contention lies in the fact that substantial performance was required of Swacker under his agreement, and as I have found, it was not forthcoming. Acts or words by Swacker tending to show that he considered the oral agreement to be subsisting are not a legally acceptable substitute for performance when the performance was not prevented by Hastings. The harsh fact is that Swacker was discharged and did not perform his agreement. It is not contended that Hastings was in any way responsible for his failure. In consequence, the contention that Swacker at all times considered the oral agreement as subsisting, if true, does

not under the circumstances of this case constitute performance by him.

It is the conclusion of the court that the oral agreement between Swacker and Hastings is unenforceable here because of the material failure of consideration on Swacker's part, which failure was in no way attributable to Hastings. See 1 *Restatement of the Law of Contracts*, § 274. Nor can there be any recovery from Hastings based on part performance under the agreement, since I believe full performance was a condition precedent to the right to recover on the agreement. Such a conclusion would seem to be required by the decision of the Court of Errors and Appeals of this state in *Bayard v. McLane*, 3 *Harr*. 139, but, in any event, is reasonable under the circumstances.

We turn now to Swacker's alternative claim for compensation based on the services actually rendered by him in the creation of the fund. All parties concede that Swacker is entitled to compensation, and the only question requiring determination is the amount he is to be paid from the fund for his services.

In determining the amount of compensation which should be awarded in cases such as this, the courts have mentioned necessarily by way of illustration, certain factors to be considered. Thus, the amount of work done, the risk involved, the experience and skill brought to bear on the case and numerous other factors are considered.

Swacker's right to substantial compensation is demonstrated by the facts. He is entitled to credit for drawing and filing the bill of complaint, and along with others, for moving the case through to issue. The "hidden effort" expended by Swacker in bringing the case to issue and attempting to procure evidence is often lost sight of, but the need therefor is well recognized by those who participate in such matters. He also brought to the case his long experience and skill in this type of litigation, as well as an

acute realization that the litigation might be detrimental to him in a pecuniary sense in view of some of the personalities brought under attack in the litigation. Other important factors serve to substantiate Swacker's claim, such as the contingent fee aspect of the case and the availability of his material to O'Donnell, and consequently to the others. However, Swacker had nothing to do with the negotiation of the settlement, and it must also be realized that Swacker took no direct part in the trial of the Overfield-Weigle cases, and the effect of those cases in bringing about the settlement was considerable. Indeed, the Pennroad Corporation as well as Swacker and Hastings concede in the briefs that the Overfield-Weigle suits must be considered as having had substantial weight in bringing about the settlement. So understood, the Overfield-Weigle cases and this case may be treated as one for purposes of ascertaining the value of Swacker's services.

I have mentioned but a few of the many factors which I have considered in determining the amount of the fee to which I believe Swacker is entitled. Swacker asks for a fee of $1,350,000. I believe such a fee is unwarranted. Considering, among other facts, that Swacker spent a substantial amount of his time on the case for seven years and that some of his material was used in the Overfield-Weigle suits, I conclude that a recovery of two per cent of the principal amount of the settlement ($15,000,000) would be reasonable. Swacker is, therefore, entitled to receive the sum of $300,000 in complete payment from the fund for his services as attorney in this litigation.

The use of a percentage of the total settlement figure rather than some other method of computing Swacker's compensation is not to be considered as particularly significant. Since most of the applications for allowances were not presented to me but to Judge Welsh, acting as arbitrator, it was necessary for me to approximate Swacker's contribution in relation to the total contribution to the creation of the

settlement fund. This approximation was rendered even more difficult by the fact that Swacker was discharged as attorney in this case in 1938, while others continued their efforts for several more years. I have decided that two per cent of the total figure would be somewhat in keeping with Swacker's own estimation of the value of his services at the time he sued his client Guiterman, and would bear a reasonable relation to what may be considered a reasonable fee to the other attorneys who carried the Pennroad litigation forward to ultimate success by way of settlement. This court, therefore, retains jurisdiction over the settlement fund to be received by the Pennroad Corporation to the extent of $300,000.

In arriving at my conclusions with respect to the Swacker claim, both as to the alleged agreement with Hastings and the fair value of his services, I have not relied upon any evidence to which objection was made on behalf of Mr. Swacker at the hearing on this matter. Also, in view of my conclusion in this case I leave undecided certain other alleged defenses asserted by Hastings and the Pennroad Corporation.

A decree in accordance with my conclusions will be advised.

Note: Affirmed on appeal *post p.* 531, 47 *A.* 2d 479, and also on subsequent and separate appeal by *Frank M. Swacken vs. The Pennroad Corporation*, et al., and cross appeal by *The Pennroad Corporation ve. Frank M. Swacker.* The opinion of the Supreme Court concerning the Swacker appeal will appear in a subsequent volume of Delaware Chancery Reports. See also 57 *A.* 2d 639.