FRANK M. SWACKER,

Respondent Below, Appellant,

*vs.*

THE PENNROAD CORPORATION, a corporation of the State of Delaware, petitioner below, and DANIEL O. HASTINGS, Respondent Below to the Petition of Frank M. Swacker,

Appellees.

THE PENNROAD CORPORATION, a corporation of the State of Delaware,

Petitioner Below, Cross-Appellant,

*vs.*

FRANK M. SWACKER,

Respondent Below, Cross-Appellee.

*Supreme Court, On Appeal, November 24, 1947.*

RICHARDS, C. J., SPEAKMAN, TERRY, CAREY, and PEARSON, JJ., sitting.

*William A. Schnader, Alexander Conn,* and *Charles E. Kenworthey,* all of Philadelphia, Pa., and *Charles F. Richards,* for appellant.

*James R. Morford,* for appellee Daniel O. Hastings.

*Morris Wolf,* of Philadelphia, Pa., and *Thomas Cooch,* for appellees and cross-appellant.

RICHARDS, Chief Justice, delivering the opinion of the court:

The history of this case was set forth in the opinion handed down by this court on May 10, 1946, reported in *Perrine, et al. v. Pennroad Corp.,* 29 *Del. Ch.* 531, 47 *A.* 2d 479, and it would serve no purpose to restate it here.

Under the terms of the settlement agreement which was entered into by Pennsylvania Railroad Company and The Pennroad Corporation, $15,000,000 was paid by Pennsylvania Railroad Company to The Pennroad Corporation, and $12,000,000 of this amount was retained by said Pennroad Corporation for the sole benefit of the Corporation and

its stockholders. The remaining $3,000,000 was set aside as a maximum amount applicable to the payment of compensation to the attorneys who were engaged in the litigation and the expenses in connection therewith.

Subsequently an arbitration agreement was entered into by The Pennroad Corporation and certain attorneys who took part in the litigation, naming Judge Welsh who had heard the related cases in the United States District Court, as arbitrator, and providing that twenty percent of the proceeds of the settlement "shall be fixed as an adequate amount from which Arbitrator make allowance and pay the costs of arbitration (exclusive of expenses and counsel fees incurred by Pennroad). Pennroad by entering into this agreement does not in any way indicate or admit that such amount shall be allowed by the Arbitrator."

Taking advantage of said arbitration agreement twelve individuals or groups, consisting of law firms and individual lawyers filed claims for allowances before Judge Welsh, who appointed counsel to hear their claims and make a report to him. One group, known as the Hastings group, consisting of the firm of Hastings, Stockly, Walz and Wise, the firm of Marshall, Carey and Doub, the firm of Evans, Bayard and Frick, and Hugh F. O'Donnell, which group not only prepared said cases for trial in the United States District Court, but was actively engaged in the trial of those cases in that court was allowed as counsel fees the sum of $1,900,000. A further allowance as counsel fees of $545,000 was made to counsel for the intervenors consisting of Shapiro & Shapiro, Hays, Podell & Shulman, Scribner and Miller, Daniel Blumenthal, Abraham Geller, Dean, Roscoe Pound, Frances E. Walter, Harry R. Axelroth, Howard R. Detweiller, Hugh Roberts, and others including Kenneth S. Guiterman, some of whom were present from time to time during the trial of the cases in the United States District Court but took no part therein.

The appellant, Frank M. Swacker, did not file his claim

with the abitrator for an allowance, but petitioned the Chancellor of this State requesting him to fix his allowance. After notice to all the parties interested, a hearing was held by the Vice-Chancellor which resulted in an allowance being made to Mr. Swacker of $300,000. An appeal from this allowance was taken to this court. While Mr. Swacker's claim was not before the arbitrator, he knew that Mr. Swacker had been allowed $300,000 by the Vice-Chancellor of this State, from which allowance an appeal had been taken, and provided that if Mr. Swacker's allowances should be increased the allowances made by him should be proportionately abated by the amount which the ultimate award to Mr. Swacker exceeds $300,000.

The only question before this court is whether the allowance of $300,000 to Frank M. Swacker for his services in connection with the Pennroad-Pennsylvania Railroad Company litigation is a proper allowance.

The originator of the Pennroad-Pennsylvania Railroad Company litigation was Mr. Kenneth S. Guiterman of New York City. He employed Mr. Markham Marshall of New York City to act in the matter for him and Marshall in. December 1930, or January 1931, called the appellant Swacker on the phone and asked him if he knew anything about Pennroad. When Mr. Swacker replied that he knew something about it Marshall asked him if he would agree to go into a stockholders' suit in connection with it. He then went to Marshall's office and met Mr. Guiterman and while there agreed to undertake the Pennroad case on a contingent basis and to share equally in fees that might be recovered. Following this agreement, he brought a suit in January 1931, in the Supreme Court of New York County, in favor of Joseph W. Perrine and Julia A. Perrine against The Pennroad Corporation and The Pennsylvania Railroad Company. The service obtained upon the defendants was set aside upon the ground that they were not doing business in New York and it became necessary to bring suit in some other jurisdiction. It was then decided to bring suit in

this State and after securing the services of Richards, Layton and Finger as associate counsel, a bill was filed in the Court of Chancery on behalf of said Joseph W. Perrine and Julia A. Perrine against The Pennroad Corporation and The Pennsylvania Railroad Company and certain directors and voting trustees named therein. Before the bill was filed in the Court of Chancery of this State it was redrafted by Mr. Swacker, with the assistance of Hugh F. O'Donnell who was then employed by him, to cover additional activities of the Pennroad Corporation in order to broaden the scope of the action, and in this form it was filed on October 18, 1932. There was considerable correspondence between Mr. Swacker and Mr. Finger, of Richards, Layton and Finger, concerning the course to be pursued in the prosecution of the litigation, and we have no doubt that much work was done by these parties in connection therewith. Two arguments were made before the late Chancellor Wolcott on questions involved in this bill. The first argument dealt with the question of constructive service under our statute and the rules of the Court of Chancery. *Perrine v. Pennroad Corporation*, 19 *Del. Ch.* 368, 168 *A.* 196; and the second dealt with the question of misjoinder of causes and multifariousness, 20 *Del. Ch.* 106, 171 *A.* 733. After these questions were decided by the Chancellor, there is no record of any further steps being taken to advance the trial of the cause in this State until the petition for the approval of the agreement of settlement was filed on or about March 16, 1945.

In the spring of 1936, Richards Layton and Finger withdrew from the case as associate counsel and in January 1937 the Honorable Daniel O. Hastings became actively engaged in the litigation. Mr. Swacker came to Wilmington and had a long conference with Senator Hastings in reference to the case, at which time it was agreed between them that whatever they might receive from the case as compensation would be equally divided between them, less from five to ten percent which should be paid to the estate of Markham Marshall who had died.

In March 1938, Mr. Swacker received a letter from Mr. Guiterman stating that he did not desire Mr. Swacker to represent him any longer in the Perrine litigation and at about the same time a letter was also received from Joseph W. Perrine to the same effect. This action of Mr. Guiterman and Joseph W. Perrine of dispensing with the services of Mr. Swacker caused much embarrassment among the other lawyers engaged in the case. Hugh F. O'Donnell first became connected with the case as an employee of Mr. Swacker and was continued in the case by Mr. Swacker after this employment ceased with the understanding that he would receive ten percent of the compensation received by Mr. Swacker. Senator Hastings became connected with the case as associate counsel at the request of Mr. Swacker and they were to handle the case on a contingent basis with the understanding that the fee to be allowed them should be divided equally subject to the provision to be made for the estate of Markham Marshall. Each of these gentlemen conferred with Mr. Swacker about the situation, who told them that Mr. Guiterman had no authority to discharge him as to the body of the stockholders and that there were other stockholders who wanted to intervene and wanted him to represent them, and that when the time became appropriate he intended to take that course. He further told them that he intended to file a suit against Mr. Guiterman on a *quantum meruit* for $300,000, covering various services up to then, including some service with respect to Pennroad, and that he would await the outcome of the Pennroad litigation and at that time elect where he stood; if satisfied with the compensation he got out of Pennroad he would abide by that, or if the Pennroad suit was abandoned or lost he reserved the right to go ahead with the suit against Mr. Guiterman. After that time Mr. Swacker took no further active part in the Pennroad-Pennsylvania Railroad Company litigation. He did talk with Mr. O'Donnell about it from time to time and offered the use of any papers he had which might be helpful, and had one or two conferences with Senator Hastings about a further agreement

as to the fees to be allowed which will be referred to later. At this stage of the proceeding Robert E. Lee Marshall of the firm of Marshall, Carey and Doub, of Baltimore, was brought into the case by Mr. Guiterman who had conferences with Senator Hastings and Mr. O'Donnell as to the course to be pursued in prosecuting the case.

Some time in 1940, Mr. Marshall filed a suit in Philadelphia, Pennsylvania, in the United States District Court for the Eastern District of Pennsylvania, on behalf of Ione M. Overfield, another stockholder of The Pennroad Corporation, and against The Pennroad Corporation, The Pennsylvania Railroad Company and certain directors and voting trustees named therein. The complaint filed in this case covered subject matter included in the complaint filed in the *Perrine* case in Delaware, but said complaint was prepared entirely by Mr. Marshall upon information obtained by him, after conferences with Senator Hastings and Mr. O'Donnell. Some time thereafter a similar suit was brought in Philadelphia in the United States District Court for the Eastern District of Pennsylvania, by Senator Hastings on behalf of Grace Stein Weigle and against the same parties named in the Overfield suit. Those suits were tried together before Judge Welsh in said United States District Court, the trial starting about February 11, 1941, and continuing for eight weeks. Those who took an active part in the trial of the case on behalf of the plaintiffs were Senator Hastings, who was designated by Judge Welsh as chief counsel; Marshall, Carey and Doub; Evans, Bayard and Frick and Hugh F. O'Donnell. *Overfield v. Pennroad Corp.*, 42 *F. Supp.* 586; *Id.* 48 *F. Supp.* 1008.

Mr. Swacker took no part in preparing these cases for trial and did not participate in the long and very difficult trial before Judge Welsh. He contends, however, that the Pennroad-Pennsylvania Railroad Company litigation was started by the Perrine case which was instituted by him in the Court of Chancery of this State and in which the bill of complaint was prepared by him. He likewise contends

that the Overfield and Weigle cases were based upon the Perrine case and that the work which he did in the Perrine case was helpful in the preparation and trial of the Overfield and Weigle cases. In pursuance of these contentions, he takes the position that the agreement which he made with Senator Hastings at the time he took him into the case as associate counsel, to divide equally the amount which should be allowed them as compensation for their services, is still in force and he therefore is entitled to one-half of the allowance made to Senator Hastings and those associated with him, amounting to $950,000.

It must be admitted that Mr. Swacker commenced the legal proceeding against The Pennroad Corporation and The Pennsylvania Railroad Company by bringing the Perrine suit in this State. The difficulty of bringing a suit of this kind is generally recognized and Mr. Swacker's knowledge of railroad litigation, and his experience in other cases of this character must have been very helpful in gathering the necessary information to enable the suit to be brought. For these services he should receive adequate compensation and all of the attorneys connected with the case seemed to agree as to that. But we cannot agree with Mr. Swacker's contention that he continued to be associate counsel in the case through all the Pennroad-Pennsylvania Railroad Company litigation, and that under the agreement entered into with Senator Hastings he is entitled to one-half of the allowance made to Senator Hastings and his group. We think it clearly appears from the testimony that Mr. Swacker recognized that he had been discharged by Mr. Guiterman and Joseph W. Perrine and from that time he took no part in the proceedings which followed against The Pennroad Corporation and The Pennsylvania Railroad Company. This position is supported by the testimony of Mr. Swacker himself before the Vice-Chancellor. In answer to the question whether he had any objection to Senator Hastings and Mr. O'Donnell continuing to represent the Perrines and Guiterman, after he had been discharged by them he replied: "Not at all. In fact, I advocated it

and thoroughly approved it." "You told Senator Hastings that he was quite free to go ahead in his representation of the Perrines? That is correct, and also O'Donnell." "And you told O'Donnell the same thing? Yes. But subject to this limitation, that they could take no steps materially affecting the policy of what might be done with respect to the litigation without first conferring with me." When asked if he said to Mr. O'Donnell in the month of May 1938, that he was not going to do anything to prevent Senator Hastings and Mr. O'Donnell from continuing the litigation, that he knew how to protect himself and was going to sue Guiterman or words to that effect, he replied "Yes, but coupled with the full explanation that I have given heretofore, I wanted them and I asked them if they would remain in the case and that I would protect myself not merely by suing Guiterman, but by intervening somebody else if and when the occasion would arise." Hugh F. O'Donnell in testifying about a conversation which he had with Mr. Swacker concerning the embarrassing position which he had been placed in by Mr. Swacker's discharge by Mr. Guiterman and the Perrines, used the following language: "Mr. Swacker on that occasion told me that I might continue in the Pennroad litigation, that he knew how to take care of himself, that he was going to sue Guiterman." In fact, Mr. Swacker did sue Mr. Guiterman in New York for $300,-000 and the suit is still held in abeyance pending a final determination of his allowance in this case.

We find that the agreement which Mr. Swacker had with Senator Hastings to divide the compensation allowed equally also meant that they would divide the work practically equally. By his failure to take any further part in the work after his discharge his agreement with Senator Hastings was terminated and consequently he cannot be heard to say that he is still entitled to one-half of the compensation allowed Senator Hastings. On more than one occasion after his services had been dispensed with Mr. Swacker spoke to other attorneys connected with the case

about a change in the agreement as to fees. In January, 1941, he said that if he was going to remain inactive and not participate in the trial, he thought the agreement ought to be modified in favor of Senator Hastings. He admitted that he went to Philadelphia during the trial of the Overfield-Weigle cases in which he took no part, to try to make a new fee arrangement with Senator Hastings.

If Mr. Swacker considered the agreement which he had with Senator Hastings for an equal division of the allowance made to them still in force, why did he have the thought that the agreement ought to be modified in favor of Senator Hastings; or why did he go to Philadelphia during the long and tedious trial of the Overfield-Weigle cases and try to make a new arrangement as to fees with Senator Hastings? It is obvious that he realized that because he had taken no part in the preparation of this case and was taking no part in its trial, and further realized that because he had done no active work in connection with the Pennroad-Pennsylvania Railroad Company litigation since his discharge, he was in a very precarious position so far as allowances were concerned and wanted to make the best arrangement he could. The fact that he brought a suit in New York against Mr. Guiterman for $300,000, based on a *quantum meruit*, also indicates that he realized that he was not on the same basis with respect to allowances that he originally was and was doing all that he could to protect himself. The explanation that he gives, that his consent that Senator Hastings and Mr. O'Donnell should remain in the case was subject to the limitation that they would take no steps materially affecting the policy of what might be done without first conferring with him, does not prove that the oral agreement between him and Senator Hastings was still in force. On the contrary it at least indicates that there had been some change in the relations which existed between them prior to that time. His claim that he is entitled to credit for the work done by Mr. O'Donnell, which it is ad-

mitted continued clear up until the settlement of the case, is not sufficient to show that he was still performing his part of the agreement with Senator Hastings, because Mr. O'Donnell was employed by Mr. Guiterman himself to continue in the case after the break with Mr. Swacker.

As already stated both Senator Hastings and Mr. O'Donnell were very much embarrassed at the turn of events and it is not claimed that they were in any way responsible for what occurred. In fact, Senator Hastings went to New York to try to straighten out the difficulty but found it impossible to accomplish anything.

The failure of Mr. Swacker by reason of his discharge to perform the work which he agreed to perform in connection with the litigation, in exchange for the work which Senator Hastings agreed to perform in connection with said litigation, caused a failure of consideration and for that reason there can be no recovery under the terms of the agreement entered into by them.

The position is also taken by Mr. Swacker, that this being a derivative action, Mr. Guiterman and Joseph W. Perrine had no right to discharge him as to the body of the stockholders of The Pennroad Corporation whom he also represents. We must not lose sight of the fact, however, that he was employed by Guiterman and Perrine and never had any agreement with the other stockholders. The remaining stockholders never employed him to represent them and the only possible connection that he can claim with them is through his representation of a fellow stockholder. When he was discharged by the fellow stockholder that connection was broken and we fail to understand how he can still claim to represent the remaining stockholders. His employment was subject to the will of his employer and did not continue as long as the litigation lasted simply because it was a class action.

The principle asserted in 7 *C.J.S.*, *Attorney & Client*, § 174, that "attorneys who jointly undertake to prosecute

or to defend a law suit are entitled, in the absence of any agreement to the contrary, to share equally in the compensation," and that mere neglect by one of them to perform his share of the work will not amount to an abandonment, is not denied. But Mr. Swacker's course after his discharge by Mr. Guiterman and Mr. Perrine amounted to more than mere neglect. From that time on he failed to take any further part in the preparation of the Perrine case for trial. As far as the Overfield case is concerned, the record discloses that the information upon which the complaint was based was gathered by Mr. R. E. Lee Marshall and said complaint prepared by him. The Weigle case was started by Senator Hastings and there is no evidence that Mr. Swacker took any part in drafting the complaint in that case or preparing the case for trial. It is not disputed that he took no part in the trial of these cases. It is undoubtedly true that the Overfield and Weigle cases were the same class of cases as the Perrine case, and counsel engaged in those cases undoubtedly obtained information from Mr. Swacker when associated with him in the Perrine case, which was helpful to them in those cases, but that does not constitute Mr. Swacker as associated counsel in the entire litigation. The Overfield and Weigle cases were both begun long after he had been discharged as counsel in the Perrine case.

All parties agree that Mr. Swacker is entitled to compensation for the services actually rendered by him to be paid from the fund set apart for that purpose. We agree with his contention that in determining the value of the services of an attorney in a case of this character consideration should be given to the amount recovered, the standing and ability of the attorney, the nature of the questions involved and the amount of time and effort put forth by him. Mr. Swacker's initiative in starting the Perrine case, his acknowledged ability and long experience in handling cases of this character and the time which he actually devoted to the case must all be considered. *R. H. McWilliams, Jr.*

*Co., Incorporated v. Missouri-Kansas Pipe Line Company,* 21 *Del. Ch.* 308, 190 *A.* 569. We have already outlined his connection with the litigation and the services performed by him.

The amount of credit which can be given to the Perrine case for bringing about the settlement agreement is hard to determine. We know, however, that The Pennroad Corporation took no interest in the litigation until after the Overfield and Weigle cases were started, and the talk of settlement did not begin until after Judge Welsh rendered his judgment for $22,104,515.

The Vice-Chancellor's allowance of two percent of the entire amount of the settlement agreement of $15,000,000, amounting to $300,000, seems to us to be fair and reasonable.

The Pennroad Corporation by its cross-appeal takes the position, that the monetary value which the Vice-Chancellor placed upon the contribution which Mr. Swacker made to the creation of the settlement fund, namely $300,000, was too much, and contends that $100,000 would be adequate for his services.

We have already traced Mr. Swacker's connection with the litigation from the time he was spoken to in New York by Mr. Markham Marshall, through the filing of the Perrine suit in the Court of Chancery in this State, down to his conference with Senator Hastings in reference to his fee, during the trial of the Overfield-Weigle case in Philadelphia.

It must be admitted that the Perrine case and the Overfield-Weigle cases were both class actions, against the same defendants, and that each case depended largely upon the same facts. It must also be admitted that Mr. Swacker actually started the litigation by preparing and filing the bill in the Perrine case. His conferences with Mr. O'Donnell and Senator Hastings were certainly helpful to them in the beginning, and the knowledge which they gained from him about class actions must have been beneficial to them throughout the litigation. If the Perrine case had gone

forward to trial in this state, and the Overfield-Weigle cases had not been tried, the settlement agreement might never have been consummated. We cannot overlook the fact, however, that said settlement agreement expressly provided that it should be approved by the Court of Chancery of this state in the Perrine case. As heretofore stated this is the case in which the complaint was prepared and filed by Mr. Swacker. It charted the course for the litigation which followed and its effect must have been felt throughout the proceedings.

After considering the evidence brought out in the hearing before the Vice-Chancellor, we are of the opinion that $300,000 is not too much for Mr. Swacker, but is a fair and reasonable allowance for him.

The decree of the Chancellor is affirmed.