ANNE K. AARON and MARTHA FRIEDBERG, ROBERT FRIEDBERG, minors by EVELYN G. FRIEDBERG, their guardian ad litem,
Plaintiffs-Below, Appellants,

*vs.*

CRITCHELL PARSONS and BEAVER LODGE OIL CORPORATION, a corporation of the State of Delaware,
Defendants-Below, Appellees.

BEAVER LODGE OIL CORPORATION, a corporation of the State of Delaware,
Defendant-Below, Appellant,

*vs.*

ANNE K. AARON and MARTHA FRIEDBERG, ROBERT FRIEDBERG, minors by EVELYN G. FRIEDBERG, their guardian ad litem,
Plaintiffs-Below, Appellees.

*Supreme Court on Appeal—July 17, 1958 .*

*George T. Coulson,* Wilmington, for plaintiffs.

*John J. Morris, Jr.,* and *Howard L. Williams,* Wilmington, for Beaver Lodge Oil Corp.

SOUTHERLAND , C. J. and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, Justice: These are cross-appeals from an order of the Vice-Chancellor allowing counsel for the plaintiffs-below a fee of $15,000.00 and out-of-pocket expenses of $1,458.78. Plaintiffs in their appeal argue that the allowance is insufficient. Defendants in their cross-appeal argue that no allowance at all should have been made plaintiffs' counsel.

The action is a derivative stockholders suit brought by the plaintiffs as minority stockholders. The defendants are Critchell Parsons,

former chairman of the Board and President of Beaver Lodge Oil Corporation, (hereafter Beaver) in whose behalf this suit is brought, and Republic National Bank of Dallas (hereafter Republic).

The complaint charges Parsons and Republic with having diverted to their own use assets of Beaver, and seeks a judgment against Parsons and Republic for $673,000.00, and for cancellation of a certain option agreement. Jurisdiction over Republic was obtained by the sequestration of certain of its property located in Delaware.

The facts material to the issue before us are briefly stated.

Following the acquisition of their stock, in early 1955 the plaintiffs caused to be investigated certain transactions by Beaver and a corporation known as Rocky Mountain Uranium Corporation (hereafter Rocky Mountain), and in December of that year it was concluded that Parsons had misappropriated funds of Beaver and had improperly diverted corporate opportunities to himself in the transactions with Rocky Mountain.

Thereupon, plaintiffs commenced an action in the Court of Chancery in Delaware, being Civil Action No. 728, naming as defendants Parsons and his fellow directors and officers of Beaver. Relief was sought for the alleged misappropriation of Beaver funds and, also, for the alleged fraud of Parsons in merging Beaver with a corporation named Tioga Oil Corporation.

In September of 1956 the plaintiffs served certain interrogatories upon Parsons in Civil Action 728, and from the answers to those interrogatories first learned of the possible liability of Republic to Beaver. Thereafter, no further action was taken in Civil Action No. 728, which apparently still remains on the docket of the Court of Chancery.

At about the same time, viz., in 1955, Atomic Development Mutual Fund, Inc., an investment company (hereafter Atomic) purchased approximately 8% of the outstanding stock of Beaver. Some-

time in the spring of 1956 it became apparent to Atomic's officers that Beaver was being mismanaged, and at their direction Merle Thorpe, Jr., counsel for Atomic, began an investigation of Beaver's affairs.

In August of 1956, in the course of a seven-day investigation conducted in Dallas, Thorpe discovered the transactions giving rise to the liability of Republic to Beaver.

Thereupon, Thorpe and his associates decided that the best course was to remove Parsons from the Beaver management. Accordingly, they formed in September, 1956 a Stockholders Protective Committee which, throughout October, November and December of that year, solicited proxies for the election of new directors of Beaver at the annual meeting to be held December 17, 1956.

The communications of the Protective Committee to other stockholders outlined the proposed course that would be taken in the event the proxy fight ended favorably to the Committee, and among other courses of action proposed, it was stated that the new management would take all possible steps for the recovery of all Beaver assets diverted to unauthorized uses.

The decision not to acquaint the stockholders during the course of the proxy solicitation with the possible liability of Republic to Beaver was made deliberately for the reason that Republic was the largest bank in the southwest and charges of misconduct against it, it was believed, would react unfavorably upon the other stockholders of Beaver, and would weaken the possibility of removing Parsons from the Beaver management. A further reason existed in the fact that Republic held $1,500,000.00 of mortgage debt of Beaver, the principal part of which was in default, thus subjecting Beaver, to the possibility of foreclosure at the option of Republic.

In November of 1956, plaintiffs' counsel got in touch with Thorpe in connection with the plans of the Protective Committee's proposal for new management of Beaver. Whether or not they were told of the Committee's knowledge of the possible liability of Republic to

Beaver and of the intention of the new management if elected to pursue all claims involving recovery of Beaver assets is in dispute.

On December 8, 1956 the plaintiffs and one Lester solicited proxies of Beaver stockholders for a full slate of directors, including Parsons, Lester, two nominees of Republic, Parson's attorney, and two nominees to be designated by Thorpe. In this letter it was stated that the Protective Committee's plan for the future management of Beaver ignored the interests of Republic.

Finally, on December 13, 1956, four days before the scheduled annual meeting of Beaver's stockholders and without at any time having given any indication of their plan to the Protective Committee, this present action was instituted and sequestration obtained of certain assets of Republic.

Thereafter, the annual stockholders' meeting of Beaver was held which resulted in the election of seven directors, four of whom were nominees of the Protective Committee and three of whom were Parsons and nominees of Republic whose election had been advocated by the plaintiffs. It is not clear from the record whether or not the proxy solicitation of the plaintiffs caused the failure to elect the full slate of seven directors proposed by the Protective Committee.

Following the election of the new directors, Thorpe was elected President and, almost at once, commenced negotiations looking toward the settlement of the Beaver claims against Republic. Six months elapsed with no progress having been made toward a settlement.

Finally, upon receiving commitments from a large insurance company of a refinancing loan to Beaver of approximately $1,400,-000.00, Thorpe notified Republic that he intended to make a tender of full payment of Beaver's debt to Republic. Upon that event Republic commenced to discuss a compromise settlement of the claims.

It seems apparent that until Beaver obtained assurance of new financing, Republic was able to curtail Beaver's independent action

by reason of the fact that Beaver was indebted to Republic, allegedly fraudulently, to such an extent that all of Beaver's income was required to service its alleged debt to Republic. The threat of foreclosure by Republic operated as a restraining influence upon Beaver until funds were obtained to give it independence of action.

Finally, a settlement agreement was reached under the terms of which Republic was to assign to Beaver its rights as pledgee to 75,000 shares of Beaver stock and a promissory note in the amount of $325,-000.00 of Rocky Mountain, all of which had been pledged to Republic to secure Parson's indebtedness to it. Republic also agreed to lend Beaver $1,700,000.00 at $4\frac{1}{2}\%$ interest payable over a ten-year period, Beaver to have an option to take $500,000.00 of that loan in the form of a sale of a production payment. Beaver on its part agreed to ratify an agreement between Republic and Parsons under which Beaver at the option of Republic was required to purchase for $250,-000.00 slightly over 200,000 shares of Beaver stock owned by Parsons and pledged to secure his personal debt to Republic. Beaver also agreed to obtain the dismissal of Civil Action 785, the present action, as to Republic with prejudice.

Upon the commencement of the settlement negotiations the present action was not actively prosecuted by the plaintiffs, or any party. This was apparently agreed upon by the parties concerned upon the request of the new management of Beaver. It would serve no purpose to catalog the procedural maneuvers through which the delay was accomplished.

The proposed settlement plan was submitted to the Vice-Chancellor for approval. Notice was sent to stockholders and a hearing held as a result of which the Vice-Chancellor approved the settlement plan.

For purposes of urging approval of the settlement its net value to Beaver was estimated to be $516,000.00. The defendants now argue that this is an inflated figure, but since this was the basis upon which the settlement was approved we think we have no choice but to accept it as the value of the settlement to Beaver. This is not to say,

however, that Beaver has in hand this amount of money in cash. Actually, by reason of the settlement, no "fund" was created in the sense that it is represented by cash in hand. The settlement in effect wiped out certain claims against Beaver, gave Beaver an opportunity to make favorable borrowings in order to finance its operations, freed a large percentage of Beaver's income from debt service, and conferred other benefits upon Beaver of an intangible nature. It seems to have put Beaver in a favorable position for future profitable operations without filling its till with an immediate large cash reserve. Actually, Beaver's balance sheet of August 31, 1957 shows total current assets of slightly less than total current liabilities. It is thus obvious that Beaver does not have liquid assets at the present time to pay a substantial sum in the way of fees and allowances.

Based upon these facts, the Vice-Chancellor made an award of a $15,000.00 fee and some $1400.00 of expenses to plaintiffs' counsel. He found as a fact that Thorpe, representing the new management of Beaver, negotiated the settlement, and that Thorpe's arrangement with the insurance company of commitments for new financing for Beaver contributed an essential element in persuading Republic to make a settlement of the differences. He further found that the role of plaintiffs' counsel in the creation of the "fund" resulting from the settlement was indirect rather than direct, and was necessarily passive. He found also, however, that the fact of pendency of this action in Delaware and the sequestration of Republic's property contributed something to the negotiation of the settlement, and that to this extent plaintiffs were entitled to an allowance for the payment of their counsel.

There is no real dispute among the parties to these appeals concerning the applicable rules of law governing the awarding of fees to plaintiffs' counsel in a successful stockholders derivative action. The general rule is that such counsel are entitled to be compensated for services and expenses which can be demonstrated to have either created or preserved the fund resulting from the litigation. *McWilliams, Jr., Co. v. Missouri Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569; *Perrine v. Pennroad Corporation*, 29 *Del.Ch.* 423, 51 *A2d* 327.

In *Swacker v. Pennroad Corp.*, 30 *Del.Ch.* 495, 57 *A.2d* 63, this court, in approving allowances to counsel in a successful derivative stockholders action, stated that in determining the amount of such an allowance consideration should be given to (1) the amount recovered by the action; (2) the standing and ability of the counsel involved; (3) the difficulty of the litigation, and (4) the amount of time and effort of counsel in connection with the case.

Assuming in accordance with the rule, that counsel is entitled to be paid from a common fund, it is obvious that the fixing of the amount of allowance involves the exercise by the Vice-Chancellor of his sound judicial discretion in balancing one factor against the other and ultimately arriving at a proper figure which measures in dollars and cents the contribution of counsel toward the creation or preservation of the common fund. We are of the opinion that all of the factors referred to must enter into the fixing of the final amount, but that of them the most important and critical is the contribution of counsel's efforts to the creation or preservation of the common fund.

Petitioning counsel seem to suggest that in all such cases an award of counsel fees must always be related directly to the benefits conferred by the action, viz., the total amount of the fund recovered. If it is intended to suggest that in all cases where an award is to be made a fixed percentage of the ultimate recovery must be allowed as fees irrespective of the percentage of contribution of the petitioner's service to the amassing of the total fund, we reject the suggestion. We accept as proper, however, a rule which would compute the award on the basis of a percentage contribution if that, under the facts, can be determined. However, it is obvious that in the ordinary case there can be no fixed mathematical formula to measure the value of such services. The problem is almost uniformly one to be solved by the sound application of judicial discretion to the particular circumstances.

Since the fixing of allowances is a matter to be determined in the discretion of the Chancellor, our power to review is that of determining whether or not his discretion has been abused. We have examined the record before us. We think the findings of fact made

by the Vice-Chancellor are amply supported by the record. Under the circumstances, we think that his finding with respect to the passive role of plaintiffs' counsel in negotiating the final settlement and his further finding that the contribution of the plaintiffs to the final settlement consisted of the sequestration of Republic's property and the bringing of it into court, supported the exercise by him of his discretion in fixing an allowance of $15,000.00 for the payment of plaintiffs counsel.

Great stress is laid by the plaintiffs upon their discovery of the existence of Beaver's claim against Republic through the medium of interrogatories filed in the now dormant first action. But this fact alone does not justify the claim that the plaintiffs' efforts alone resulted in the successful conclusion of Beaver's claim. It seems clear that in August of 1956 Thorpe had unearthed the facts with reference to Beaver's claim against Republic, independent of any assistance from plaintiffs. Whether or not he communicated these facts to plaintiffs is in dispute, as is also the fact of whether or not plaintiffs communicated their knowledge to Thorpe. It seems fair to conclude that both sides independently learned of the claim against Republic. Undisputed, however, is the fact that Thorpe rebuffed the attempt of plaintiffs to ally themselves with him in the proxy contest. It would be legitimate to conclude that Thorpe's rejection of their overtures perhaps decided the plaintiffs to put the door ajar by bringing this present action to first assert the claim they had known of for approximately three months, and which they saw might finally escape their control.

The Vice-Chancellor, nevertheless, found as a fact that the sequestration of Republic's assets had a coercive effect to achieve the ultimate settlement. We cannot say that to have so found is error as an abuse of his discretion. On the other hand, had he found otherwise, we would have been compelled to find no error in such a finding.

The judgment below is affirmed.